**UNITED STATES of America**

v.

**John FIORAVANTI, Nicholas Panaccione, and Angelo Pepe, Nicholas Panaccione, Appellant.**

**No. 17398.**

United States Court of Appeals Third Circuit.

Argued March 27, 1969.

Decided June 16, 1969.

Certiorari Denied Oct. 13, 1969. See 90 S.Ct. 97.

Harvey Weissbard, Querques, Isles & Weissbard, Orange, N. J., (Daniel E. Isles, Orange, N. J., on the brief), for appellant.

Wilbur H. Mathesius, Asst. U. S. Atty., Newark, N. J., (David M. Satz, Jr., U. S. Atty., John P. Nulty, Asst. U. S. Atty., Newark, N. J., on the brief), for appellee.

Before SEITZ, ALDISERT and STAHL, Circuit Judges.

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

This is an appeal from a conviction in a counterfeiting case in which the appellant was found guilty by a jury largely on the testimony of a Secret Service Agent who testified that the appellant and two other defendants, who pleaded guilty to the charges, had participated with him in the negotiations for and the delivery of a quantity of counterfeit money.[1]

At trial, the agent testified on direct examination that, acting in an undercover capacity, he made arrangements with the co-defendant Pepe to purchase the counterfeit currency. The agent was instructed to meet Pepe's partner in a train station in Trenton, New Jersey.

Co-defendant Fioravanti met him as planned and instructed him to go to the bar where a man would appear with the key to a locker containing the money. Appellant entered the bar, and being advised by Fioravanti that the secret agent was the man who came to purchase the counterfeit money, he reached into his pocket, took out a key, and handed it to Fioravanti, who in turn gave it to the agent. Fioravanti instructed the agent to go to the locker and examine the money. If satisfied, he was to return and pay Fioravanti.

The agent followed the instructions. Satisfied that the money in the locker was counterfeit, he gave a pre-arranged signal to other Secret Service operatives who pounced upon the group and placed all of them, including the agent, under arrest.[2] The four men were taken to the United States Marshal's Office, and for a short time, were confined in a detention room colloquially referred to as the "bull pen."

On cross-examination by appellant's counsel, the agent was asked to disclose the conversations between him and the appellant while both were confined in the bull pen. No mention of this conversation was made on direct examination by the government. In response to the question put to him by appellant's counsel, the agent reported that appellant said "that Mr. Fioravanti had too much heat, that if he had known I had come from New York, he would have delivered the money himself directly to me rather than come through Mr. Fioravanti, who had too much heat on him."

Appellant has made numerous assignments of error which we have carefully considered. We conclude, however, that only three of them warrant discussion in this opinion: (1) whether the lower court abused its discretion in disallowing certain discovery requests; (2)

---

1. Appellant was convicted of possession of counterfeit money with intent to defraud, and aiding and abetting in the attempted sale, in violation of 18 U.S.C.A. §§ 472 and 473.

2. The agent testified that his arrest was simulated to protect his undercover status.

whether the reception into evidence, without objection, of appellant's incriminating statement constituted a violation of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and (3) whether the court's use of the so-called "Allen Charge" was reversible error.

## I. DENIAL OF DISCOVERY

In a widely-ranging request for discovery, defendant asked the court to order the government to disclose "anything which is or could be helpful to the defendant in the preparation of his defense," [3] and to set forth in detail "how the Government intends to prove that the defendant, Panaccione, knew that the obligation of the United States referred to in this count were 'falsely made, forged and counterfeited'." In addition there was also a request for "written or recorded statements, confessions or admissions made by the defendant, Panaccione, or by any co-defendant named in the instant indictment, or any copies thereof.  *  *  *" [4]

The extent to which pretrial discovery should be permitted in federal criminal cases is admittedly a complex and controversial question.[5] All of the ramifications of Amended Rule 16, purportedly liberalizing discovery, have not yet been explored. Nonetheless, there are certain basic principles governing the scope of discovery which have become firmly entrenched.

■ First, an application for relief under the discovery rules is a matter within the sound discretion of the district court [6] and its ruling will be disturbed only for an abuse of discretion.[7] Appellate courts have been increasingly reluctant to find that the denial of a particular discovery motion was an abuse of discretion in the absence of a showing that the defendant was prejudiced by such denial.[8] Here, appellant has not attempted to show any actual prejudice in the sense that the material requested in his discovery motion had a definite bearing on the issue of either guilt or punishment. Instead, he contends that the denial of all his pretrial motions was *per se* prejudicial.

3. The request was "for an order directing the United States Attorney to disclose, and have a continuing duty to disclose, to counsel for the defendant, Panaccione, all information in whatever form which is or could be helpful to the defendant in the preparation of his defense, of which the United States Attorney may know or learn of by inquiry of the Secret Service or any other governmental agency by the exercise of due diligence."

4. Appellant argues that a "crass, capricious, *in toto* denial of any requested discovery as this case evidences is per se prejudicial" and reversible error. This argument is specious; it assumes that appellant was entitled to any or all of the items requested in his discovery motion, and it assumes that there was in fact some discoverable evidence which would have aided in the defense of the case.

5. Most of the recent legal literature has been in favor of increasing the range of permissible discovery. The courts have also generally acknowledged that "[t]he rule has been revised to expand the scope of pretrial discovery. At the same time provisions are made to guard against pos-

sible abuses." See Advisory Committee's Note to Rule 16, and the cases and articles cited therein, 34 F.R.D. 411, 423 (1964).

6. Other courts have said that the "discretion" vested in the court by Rule 16 is to allow the government to show a special circumstance which would preclude the release of all or a part of a statement. See United States v. Bailey, 262 F.Supp. 331 (D.C.Kan.1967). Still others place the burden on the defendant to show a legitimate need for the requested discovery. See United States v. Leighton, 265 F.Supp. 27 (S.D.N.Y.1967). 2 Orfield, Criminal Procedure Under the Federal Rules, § 16 :13, 1968 Pocket Supp., "Discovery of a defendant's statements under the amended rule is discretionary."

7. Gevinson v. United States, 358 F.2d 761 (5 Cir. 1966), cert. denied 385 U.S. 823, 87 S.Ct. 51, 17 L.Ed.2d 60 (1966) ; United States v. Kelley, 254 F.Supp. 9 (S.D. N.Y.1966).

8. Hemphill v. United States, 392 F.2d 45, 48 (8 Cir. 1968).

Secondly, we do not believe that Rule 16 requires the prosecution to disclose all the minutia of its evidence, to reveal its trial strategy, and to delineate with total specificity the case it intends to present.[9] Without negating the premise that certain demands for evidentiary material may be within bounds of permissible discovery, we simply say that the lower court here did not abuse its discretion in denying a motion for the production of "all evidence favorable to the accused" and "how the Government intends to prove [an element of the substantive offense charged]," where the defendant failed to set forth a reasonable description of the requested information which the government attorney and the court could use as a guideline.[10]

Appellant suggests that the broad language of Brady v. State of Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), automatically commands the district court to order a wholesale disclosure of "all evidence favorable to the accused." In *Brady*, the harm consisted of a withholding by the government of certain evidence which would have exculpated the defendant.[11] Here the reverse was true. The government possessed no exculpatory evidence, but only the government agent's notes of incriminatory statements made by the defendant and various other information not materially in issue.[12] And when the

---

9. See Wyatt v. United States, 388 F.2d 395 (10 Cir. 1968); United States v. Kelley, *supra*, note 7, United States v. Crisona, 271 F.Supp. 150 (S.D.N.Y.1967).

10. See Gregory v. United States, 125 U.S. App.D.C. 140, 369 F.2d 185, 188 (1966), where the court said: "A related development in the criminal law is the requirement that the prosecution not frustrate the defense in the preparation of its case. Information favorable to the defense must be made available to the defense," citing Brady v. Maryland, 373 U. S. 83, 83 S.Ct. 1194 (1963). The facts of the instant case do not disclose that the prosecution "frustrated the defense" in the preparation of its case.

11. In *Brady*, the Court relied on the prior case of Mooney v. Holohan, 294 U.S. 103, 112, 55 S.Ct. 340, 79 L.Ed. 791 (1935), which held that "It is a requirement that cannot be deemed to be satisfied by mere notice and hearing if a state has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured." The result in Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), was based on a similar rationale: "a conviction must fall under the Fourteenth Amendment when the prosecution 'although not soliciting false evidence, allows it to go uncorrected when it appears,' * * *." See also Giles v. Maryland, 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967); Les-

sard v. Dickson, 394 F.2d 88 (9 Cir. 1968); Williams v. Dutton, 400 F.2d 797. (5 Cir. 1968).

More recently, the Court indicated in United States v. Augenblick, 393 U.S. 348, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969), that although knowing use of perjured testimony would create a problem of constitutional dimensions (citing Brady v. Maryland, *supra*, and Mooney v. Holohan, *supra*), denial of a motion to produce under the Jencks Act did not, because of the discretion vested in the trial judge.

12. Appellant also argues that notes of the conversation between himself and the secret agent constituted a "statement" within the meaning of Rule 16(a), and that when in response to his discovery motion the government asserted that there was no statement, this was false, and that accordingly, the court's denial of his motion to produce this statement was a denial of due process of law.

The district court has discretion in ordering the production of statements qualifying under the rule. Walsh v. United States, 371 F.2d 436 (1 Cir. 1967); Loux v. United States, 389 F.2d 911 (9 Cir. 1968); Kreuter v. United States, 376 F. 2d 654 (10 Cir. 1967).

Appellant's position here is less tenable than the defendant in United States v. Augenblick, 393 U.S. 348, 89 S.Ct. 528 (1969), where the Court discussed whether written notes of a government agent should have been given to the defendant at trial upon his request pursuant to the Jencks Act. In the case before us the appellant did in fact obtain the notes at

report of the agent was requested by appellant's counsel at trial it was readily turned over to him.

## II. MIRANDA ARGUMENT

We now turn to the question whether the court committed plain error in admitting the statement made while in custody without previous *Miranda* warnings. To argue this point successfully appellant must surmount two obstacles: he must recognize that the record does not affirmatively disclose that the statement was the product of police interrogation; he must demonstrate that the reception of this evidence, without objection and at the instance of defense counsel, amounted to plain error.

■ The proscription of the Fifth Amendment does not foreclose the introduction of all testimony of the defendant; the mischief it seeks to avoid is the use of any process which compels a defendant to make testimonial utterances against his will. If no compulsion, active or constructive, has been used to elicit the utterance, then there has been no perforation of the constitutional shield.

Traditionally, the courts have been able to discern active forces which fashion a form of testimony which is not the product of a voluntary act.[13] In recent years, the concept of compulsion or coercion has been further refined to delineate circumstances where even absent active, outward forces of coercion, the mere presence of certain conditions gives rise to constructive forces capable of negating the voluntariness of a given utterance.

Thus, in *Miranda,* and cases which inspired it, the Court determined that the presence of two conditions are capable of converting utterances from a voluntary to an involuntary status. The defendant's statement is enveloped by the protective shield of the Fifth Amendment when these two factors are present:

trial, and was denied them only at the discovery stage.

In *Augenblick* the Court held that it was not error to deny the production at trial, stating:

"It is difficult to tell from this record the precise nature of * * * [the] 'notes,' whether they recorded part of * * * [the] interview or whether they were merely a memorandum giving names, places, and hours. Certainly they were not a statement covering the entire interview * * *. Since on examination of the record we are left in doubt as to the precise nature of the 'notes,' we cannot say that the command of the Jencks Act was disobeyed * * *.

"Moreover, we said in Palermo v. United States, *supra,* 360 U.S. 343 at 353, 79 S.Ct. [1217, 3 L.Ed.2d 1287] that the administration of the Jencks Act must be entrusted to the 'good sense and experience' of the trial judges subject to 'appropriately limited review of appellate courts.' We cannot conclude that when it came to the 'rough notes' * * * [there was any abuse of discretion] in holding they need not be produced under the Jencks Act." 393 U.S. at 355, 89 S.Ct. at 533.

Numerous cases hold that a defendant is not entitled in discovery proceedings under 16(a) to admissions summarized in internal governmental memoranda because those memos are not "statements" within the meaning of the rule. See, e. g., Kaplan v. United States, 375 F.2d 895 (9 Cir. 1967) ; United States v. Federman, 41 F.R.D. 339 (D.C.N.Y.1967) ; Walsh v. United States, 371 F.2d 436 (1 Cir. 1967). Others hold that the government need not produce any statement that it does not intend to use and does not use at trial in its case in chief. See United States v. Louis Carreau, Inc., 42 F.R.D. 408 (S.D.N.Y.1967). In Walsh v. United States, *supra,* at 437 the court said that it was not error to refuse production in discovery proceedings where there were no formal statements of the defendant, but only conversations between defendant and an F.B.I. agent, which the agent had summarized in a report and turned over to defense counsel pursuant to the Jencks Act. The within case is on all fours with *Walsh.*

13. See, e. g., Brown v. Mississippi, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936) ; Chambers v. Florida, 309 U.S. 227, 60 S.Ct. 472, 84 L.Ed. 716 (1940) ; Canty v. Alabama, 309 U.S. 629, 60 S.Ct. 612, 84 L.Ed. 988 (1940) ; White v. Texas, 310 U.S. 530, 60 S.Ct. 1032, 84 L.Ed. 1342 (1940).

(1) the defendant's being in custody or otherwise significantly deprived of his freedom of action by the police; and (2) the defendant's being subject to interrogation by the police.

In *Miranda* the Court said: "the *prosecution may not use* statements, whether exculpatory or inculpatory, stemming from custodial *interrogation* of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean *questioning initiated by law enforcement officers* after a person has been taken into custody or otherwise deprived of his freedom in any significant way." 384 U.S. at 44, 86 S.Ct. at 1612 (emphasis supplied).

The Court further defined the privilege of the Fifth Amendment and its relationship to custodial interrogation as a constructive force negating the voluntariness of a given statement: "The Fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be *interrogated*. There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. *Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today."* 384 U.S. at 478, 86 S.Ct. at 1630 (emphasis supplied).

■ Thus, *Miranda* has created a presumption of coercion by the mere presence of the dual factors of a police-initiated interrogation and the defendant's being in custody. The presump-

tion is based on the common knowledge of the fear which may possess an ordinary citizen when confronted with the unfamiliar surroundings of the stationhouse, or the anxiety which may be generated by the relentless interrogation of an officer of the law in other surroundings where the defendant is deprived of his freedom of action.[14] This presumption of coercion may be rebutted by the simple expedients of the defendant's having counsel present or perfecting a knowledgeable and intelligent waiver of the right to remain silent and to have counsel at his side.

Once the cloak of the presumption is removed, and with it the concept of constructive compulsion, the constitutional prohibition also falls; the statement then becomes a voluntary utterance.

It is from this perspective that we must view the *Miranda* arguments advanced by appellant. And, so doing, we find them to be of no avail to him. There is no proof that the admittedly in-custody statement resulted from any police "interrogation" or "questioning" as contemplated by the Court in *Miranda.* The record discloses only that a statement was volunteered to the Secret Service Agent while both were in the bull pen. As Chief Justice Warren stated in *Miranda:* "Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding."

■■ Here, it is inconceivable that the defendant could have experienced the coercion-born type of fear and intimidation set forth in *Miranda,* because when he volunteered this incriminatory statement, he thought that he was conversing with a fellow partner in crime, not a policeman.[15] The predicate of *Miranda*

14. See Orozco v. Texas, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969), which emphasized that the concept of in-custody is not limited to the four walls of a stationhouse.

15. Although counsel for appellant has not briefed or argued the point, we deem it necessary to state our belief that the use

of the secret informer in this case did not violate appellant's Fourth, Fifth or Sixth Amendment rights. A much stronger argument for the violation of these rights was presented, but rejected, in Hoffa v. United States, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966). There the issue was whether the evidence obtained by the

is the inherently coercive nature of police interrogation of a person in custody; it cannot have application to a situation where one, not under stress of interrogation, simply volunteers a statement which perchance turns out to be inculpatory.

■ Even if the extra-judicial statement had emerged from police interrogation, it could not find comfort in the *Miranda* sanctuary because it was transformed into courtroom testimony through the action of defendant's own counsel.[16] This case presents an even stronger argument for denying relief than did United States v. Armetta, 378 F.2d 658 (2 Cir. 1967), where the court held that defense counsel's failure to object to the introduction of a statement taken in violation of *Miranda* precluded relief and that its reception into evidence did not amount to "plain error." We can see no reason for deviating from the generally accepted rule that where the injection of the allegedly inadmissible evidence is attributable directly to the action of the defense, its introduction does not constitute reversible error.[17]

## III.  THE ALLEN CHARGE

At the conclusion of its charge to the jury, the trial court made the following observations:

"Now, members of the jury, I respectfully tell you it is necessary for the purpose of finding a verdict that all of you agree upon that verdict.  In other words, when I say the verdict has to be unanimous, it has to be twelve to nothing.

"It is your duty, however, to agree, if possible.  When conferring with each other, you should pay a proper respect to each other's opinions and examine such differences in a spirit of fairness and candor.  This does not mean any member of the jury shall yield his well-grounded opinions or violate his oath.  It does mean he shall

government by means of deceptively placing a secret informer in the quarters of the defendant during a criminal trial violated his constitutional rights.

As to the Fourth Amendment argument, the Court said: "What the Fourth Amendment protects is the security a man relies upon when he places himself or his property within a constitutionally protected area. * * * It is obvious that the petitioner was not relying on the security of his hotel suite when he made the incriminating statements to [the informer]. * * * Neither this Court nor any member of it has ever expressed the view that the Fourth Amendment protects a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it." 385 U.S. 301–302, 87 S.Ct. 413.

Regarding the Fifth Amendment claims, the Court held: "In the present case no claim has been or could be made that the petitioner's incriminating statements were the product of any sort of coercion, legal or factual.  The petitioner's conversations * * * were wholly voluntary.  For that reason, if for no other, it is clear that no right protected by the Fifth Amendment * * * was violated in this case." 385 U.S. 304, 87 S.Ct. 414.

The Court also made clear that the use of secret informers is not per se unconstitutional as a deprivation of due process of law based on the notion that such a practice is "unfair" or "offend[s] those canons of decency and fairness which express [our] * * * notions of justice * * *." 385 U.S. at 310–311, 87 S.Ct. at 418.

Unlike the situation in *Hoffa*, the Secret Agent in the instant case was "arrested" and placed in the cell to preserve his "cover" and for his own self-protection, not to spy on the accused.

16. No allegation of ineffectiveness of counsel has been made.  Appellant says that he omits such an argument because of inadequate grounds to support it.

17. See also Groshart v. United States, 392 F.2d 172, 178, footnote 4 (9 Cir. 1968), where the court indicated that no error would be committed if a statement taken in violation of *Miranda* were introduced by defense counsel; Johnson v. United States, 125 U.S.App.D.C. 172, 369 F.2d 949 (1966) ; "*Escobedo* is unavailable to appellant because the testimony of the prosecution to which objection is made was given in rebuttal of testimony which had been elicited explicitly by appellant's own counsel in aid of the defense."

not stand out in an unruly and obstinate way through mere stubbornness. Members of the jury should always closely scrutinize the facts from their own standpoint and the viewpoint also of the fellow-members of the jury.

"While undoubtedly the verdict of a jury should represent the opinion of each individual juror, it by no means follows opinions may not be changed by conferences in the jury-room. The very object of a jury system is to secure unity by a comparison of these views. *The jury should listen with deference to arguments of fellow-jurors and distrust of his own judgment if he finds a large majority of the jury* *taking a different view of the case from that what he does, himself."* (*Emphasis added.*)

The defense thereupon took specific objection to the inclusion of this last sentence in what is commonly referred to as the "Allen Charge." The name is derived from the case of Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896), in which the Supreme Court approved a similar charge, reprinted below.[18]

Since its approval over seventy years ago, the Allen Charge has persisted through the years, not so much an object of commendation as it is a product of toleration.[19] Its continued existence is

---

18. The charge in *Allen* was substantially as follows:

"* * * although the verdict must be the verdict of each individual juror, and not a mere acquiescence in the conclusion of his fellows, yet they should examine the question submitted with candor, and with a proper regard and deference to the opinions of each other; that it was their duty to decide the case if they could conscientiously do so; that they should listen, with a disposition to be convinced, to each other's arguments; that, if much the larger number were for conviction, a dissenting juror should consider whether his doubt was a reasonable one which made no impression upon the minds of so many men, equally honest, equally intelligent with himself. If, upon the other hand, the majority were for acquittal, the minority ought to ask themselves whether they might not reasonably doubt the correctness of a judgment which was not concurred in by the majority."

19. In "Some Suggested General Instructions in Particular Federal Criminal Cases," 27 F.R.D. 39, 102–104 (1960), the late Judge William C. Mathes asserted that the substance of Judge Hoar's classic instruction in Commonwealth v. Tuey, 62 Mass. (8 Cush.) 1 (1851), has been approved by the Supreme Court in Allen v. United States, *supra*, footnote 18, and the following circuit courts of appeal: Bord v. United States, 76 U.S.App.D.C. 205, 133 F.2d 313, 315 (1942); Boston & M. R.R. v. Stewart, 254 F. 14, 17–18 (1 Cir. 1918); United States v. Commerford, 64 F.2d 28, 31 (2 Cir. 1933); Shaffman v. United States, 289 F. 370, 374–75 (3 Cir. 1923); Lias v. United States, 51 F. 2d 215, 218 (4 Cir.), aff'd 284 U.S. 584, 52 S.Ct. 128, 76 L.Ed. 505 (1931); Weathers v. United States, 126 F.2d 118, 119–120 (5 Cir. 1942); Israel v. United States, 3 F.2d 743, 745–746 (6 Cir. 1925); Paschen v. United States, 70 F.2d 491, 503–504 (7 Cir. 1934); Bowen v. United States, 153 F.2d 747, 751–752 (8 Cir.), cert. den., 328 U.S. 835, 66 S.Ct. 980, 90 L.Ed. 1611 (1946); Shea v. United States, 260 F. 807, 808–810 (9 Cir. 1919).

We are somewhat more hesitant to make generalizations about the acceptance of the Allen Charge by the various courts. Because of the myriad of factual situations in which the propriety of the so-called Allen Charge may have been questioned, and the absolute lack of a paradigmatic case which can be used as a base of comparison, we have concluded that each of the decisions must be considered on the peculiar facts presented to the appeals court.

For example, the appropriateness of the charge has depended upon such varied circumstances as the degree of emphasis placed upon the conflicting considerations of the desirability of agreement as opposed to the duty of each individual juror not to surrender his individual conscientious judgment. Costello v. United States, 255 F.2d 389, 398 (8 Cir. 1958), cert. den. Cannella v. United States, 358 U.S. 830, 79 S.Ct. 51, 3 L.Ed.2d 69; Wegman v. United States, 272 F.2d 31, 35 (8 Cir. 1959); United States v. Curcio, 279 F.2d 681 (2 Cir. 1960); White v. United States, 279 F.2d 740, 750 (4 Cir. 1960); Walker v. United States, 342 F. 2d 22 (5 Cir. 1965), the length of time for which the jury had been deliberating when the charge was given Andrews v. United States, 309 F.2d 127 (5 Cir. 1962);

ostensibly justified as a device to generate verdicts, and thus eliminate hung juries. Laudatory as this rationale may appear on superficial impression, there is, upon serious contemplation, no sound basis to the hypothesis.

So long as the unanimous verdict is required in criminal cases, there will always be three possible decisions of the jury: (1) not guilty of any charge; (2) guilty of one or more counts of the indictment; and (3) no verdict because of a lack of unanimity. The possibility of a hung jury is as much a part of our jury unanimity schema as are verdicts of guilty or not guilty. And although dictates of sound judicial administration tend to encourage the rendition of verdicts rather than suffer the experience of hung juries, nevertheless, it is a cardinal principle of the law that a trial judge may not coerce a jury to the extent of demanding that they return a verdict.[20]

It is also suggested that the Allen Charge is justifiable because it encourages the minority to consider the viewpoint of the majority; that this invitation to see the other man's point of view will discourage stubbornness, narrow-mindedness, and contrariness on the part of a few who would otherwise unnecessarily retard the workings of justice.

To accept the validity of this reasoning is to assume an inherently faulty major premise: that the majority is right and has reached its preliminary inclination by appropriately inspired processes, and that the minority in a given group possesses attributes of spurious rationality. But good reason does not depend upon numbers. A quantity of like impressions does not endow a conglomerate with the hallmark of sound judgment. Indeed, as the history of this nation has witnessed, it is often a conscientious and determined minority which proves to be the safeguard against outrageous conduct wrought by tides and currents of public opinion.

In order for the underlying postulate of the Allen Charge—an instruction to consider the point of view of others—

---

Walker v. United States, *supra;* United States v. Tolub, 309 F.2d 286, 289 (2 Cir. 1962), and the precise wording of the charge itself, Powell v. United States, 297 F.2d 318, 322 (5 Cir. 1961). On occasion, relief has been denied not because the charge was approved, but because of the court's belief that its use did not amount to "plain error." Williamson v. United States, 365 F.2d 12 (5 Cir. 1966).

Out of the plethora of cases researched, few consistent patterns have emerged, although some general condemnations of the Allen Charge have been proffered. A strong plea for the demise of the Charge was made in Huffman v. United States, 297 F.2d 754, 755, 759 (5 Cir. 1962) (dissenting opinion). See also Jenkins v. United States, 117 U.S.App.D.C. 346, 330 F.2d 220, 221 (1964) (dissenting opinion); Andrews v. United States, 309 F.2d 127 (5 Cir. 1962) (dissenting opinion); Green v. United States, 309 F.2d 852 (5 Cir. 1962); State v. Voeckell, 69 Ariz. 145, 210 P.2d 972 (1949) (dissenting opinion); State v. Thomas, 86 Ariz. 161, 342 P.2d 197 (1959).

**20.** That a judge may not "coerce" the jury into reaching a verdict has long been recognized, the only disagreement being as to what constitutes "coercion." In the earlier cases, the courts tended to accept as within the legitimate discretionary function of the trial judge anything that was short of outright intimidation of the jury through bluntly-worded threats of indefinite physical confinement or suggestions that the contempt power of the court could remedy an unruly jury. See Note, 31 U.Chi.L.Rev. 386 (1964). Courts later developed more sophisticated notions of "coercion," condemning even subtle intrusions into the neutral area of jury deliberations. See Peterson v. United States, 213 F. 920 (9 Cir. 1914) (court's inquiry into the division of the jury and statement that the government had a right to expect a verdict without further expenditure of time and money held to be reversible error); Brasfield v. United States, 272 U.S. 448, 47 S.Ct. 135, 71 L. Ed. 345 (1926) (asking the extent of the numerical division in the jury is ground for a reversal though no exception taken below); United States v. Samuel Dunkel & Co., 173 F.2d 506 (2 Cir. 1949) (court's inquiry whether there was a pronounced majority held to be reversible error).

to be free of prejudicial inclinations, it would have to be expanded to read:

"A Juror should listen with deference to his fellow jurors and with distrust of his own judgment if he finds that a large majority of jurors take a different view from that which he or she takes. Similarly, in such circumstances, one in the majority should distrust his own judgment if he finds a minority of jurors taking a different view from that which he or she takes."

And such a charge, of course, would be an invitation to a frolic with Alice in Wonderland.

Thus is revealed the very real treachery of the Allen Charge. It contains no admonition that the majority reexamine its position; it cautions only the minority to see the error of its ways. It departs from the sole legitimate purpose of a jury to bring back a verdict based on the law and the evidence received in open court, and substitutes therefore a direction that they be influenced by some sort of Gallup Poll conducted in the deliberation room.

All of this constitutes an unwarranted judicial invasion into the exclusive province of the jury and adds the blind imprimatur of the trial court to a matter of which it has absolutely no information: the results of the preliminary balloting in the jury room. To the product of this informal poll is added the gloss of trial judge approval. A syllogism employed by Justice Udall in State v. Voeckall, 69 Ariz. 145, 210 P.2d 972, 979 (dissenting opinion), aptly illustrates the effect which the Allen Charge might well have on the jury:

" 'The majority think he is guilty; the Court thinks I ought to agree with the majority so the Court must think he is guilty. While the Court did tell me not to surrender my conscientious convictions, he told me to doubt *seriously* the correctness of my own judgment. The Court was talking directly to me, since I am the one who is keeping everyone from going home. So I will just have to change my vote.' "

Moreover, the Allen Charge serves to substitute the coercive influence of any early polling of the jury for the give and take of group deliberation, a basic attribute of the jury system often expressed as a major characteristic justifying its continuance in our judicial system.

In reporting on psychological studies of small groups with decision-making tasks, Professor Charles W. Joiner, Dean of Wayne State University Law School, has said: "The give-and-take of group deliberation screens out errors, negates biases, and eliminates erroneous hypotheses to a far greater extent than individual deliberation. It was found that the interaction during deliberation was the crucial difference that made group decisions more just than a pooling of individuals without the give-and-take of deliberation." [21]

The jury persists as the finder of fact because it is designed to be a deliberative body, charged with the responsibility of exchanging ideas, and with the concomitant practices of arguing and influencing. A judicial barrier should not be erected in the jury room to discourage free and open discussion.

If the validity of the unanimous jury verdict requirement is to persevere, appropriate respect must be extended and due protection afforded to the incidence of group interaction, for this is the only justification for a verdict requiring a quantum of agreement in excess of a simple majority.

The requirement of a unanimous jury verdict for criminal cases in the federal

21. Civil Justice and the Jury, Pages 26–27 (Prentice-Hall, 1962), citing Gurnee, "A Comparison of Collective and Individual Judgments of Facts," 21 J.Exp.Psychol. 106–12 (1937); Timmons, "Decisions and Attitudes as Outcomes of the Discussion of A Social Problem," Contrib.Educ.No. 777, New York Teachers College, Columbia University, Bureau of Publications (1939); Thorndike, "The Effect of Discussion Upon the Correctness of Group Decisions, When the Factor of Majority Influence Is Allowed For," 9 J.Soc.Psychol. 343–62 (1938).

courts[22] and in all but a handful of states[23] is eloquent testimonial that something more than a majority vote is desired.[24] In this respect the jury system is unique. No other deliberative body in the world requires unanimity— be it the Congress of the United States, the College of Cardinals, the Boards of Directors or our great corporations, this court of appeals, or the United States Supreme Court. The proponents of the jury system maintain that a greater degree of accuracy is guaranteed from this process of give and take which is invariably essential to reaching unanimity.[25]

■ In addition to the unsettling effect which a strategically inserted Allen Charge might have on the constitutional requirement of unanimity, its effect on the necessity for proof beyond a reasonable doubt makes it doubly circumspect.[26] The presumption of innocence protects the defendant until such time as the prosecutor convinces the jury beyond a reasonable doubt that the defendant has

22. Thompson v. Utah, 170 U.S. 343, 18 S. Ct. 620, 42 L.Ed. 1061 (1898), interpreted the sixth amendment as requiring a 12-man jury in serious criminal cases, and Maxwell v. Dow, 176 U.S. 581, 586, 20 S.Ct. 448, 44 L.Ed. 597 (1900) requires that the jury return a unanimous verdict before guilt can be found. The continued vitality of the jury-trial requirement in criminal cases is witnessed by recent Supreme Court cases holding that the sixth amendment right to trial by jury is applicable to the states through the fourteenth amendment, and that criminal contempt cases, must, under certain circumstances, be tried by jury. Duncan v. Louisiana, 391 U.S. 145, 149, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968); Bloom v. Illinois, 391 U.S. 194, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968).

It is doubtful, however, whether *Bloom* means that the states are now obligated to comply with all past interpretations of the Sixth Amendment. But, as Justice White indicated in *Bloom, supra,* at pp. 158–159, 88 S.Ct. at p. 1452 footnote 30, "most of the States have provisions for jury trials equal in breadth to the Sixth Amendment * * *. Indeed, there appear to be only four States in which juries of fewer than 12 can be used without the defendant's consent for offenses carrying a maximum penalty of greater than one year. Only in Oregon and Louisiana can a less-than-unanimous jury convict for an offense with a maximum penalty greater than one year."

23. Ten states authorize first-stage trials without juries for crimes carrying lengthy penalties, but these states give a convicted defendant a right to a trial *de novo* before a jury in a different court. Duncan v. Louisiana, *supra,* at p. 159, 88 S.Ct. 1444, footnote 30.

24. "A unanimous verdict is required because of the magnitude of the consequences, because of the improbability that twelve men of disparate experience and background could each err in arriving at the same conclusion. As to guilt, only a high degree of certainty can salve the conscience of society (as represented by the judge) and overcome reluctance to impose punishment upon one of its members." Moore's Federal Practice, Vol. 8, ¶ 31.04, pp. 31–7. See Hibdon v. United States, 204 F.2d 834, 838, 37 A.L.R.2d 1130 (6 Cir. 1953).

25. Joiner, Civil Justice and the Jury, *supra,* p. 27, citing Dashiell, "Experimental Studies of the Influence of Social Situations on the Behavior of Individual Human Adults," Handbook of Social Psychology (ed. Murchison) 1097–1158 (1935); Kelley and Thibaut, "Experimental Studies of Group Problem Solving and Process," Handbook of Social Psychology (ed. Linzey) (1954).

26. It has been suggested that "[t]he unanimity of a verdict in a criminal case is inextricably interwoven with the required measure of proof. To sustain the validity of a verdict by less than all of the jurors is to destroy this test of proof for there cannot be a verdict supported by proof beyond a reasonable doubt if one or more jurors remain reasonably in doubt as to guilt." Hibdon v. United States, 204 F.2d 834, 838 (6 Cir. 1953). See also Billeci v. United States, 87 U.S.App.D.C. 274, 184 F.2d 394, 403 (1950): "An accused is presumed to be innocent. Guilt must be established beyond a reasonable doubt. *All twelve jurors must be convinced* beyond that doubt; if only one of them fixedly has a reasonable doubt, a verdict of guilty cannot be returned." (emphasis supplied)

committed the crime for which he stands accused.[27]

■ We are convinced that the traditional measure of proof in criminal cases envisions a "subjective standard" —viz, each individual juror must be convinced of the defendant's guilt beyond a reasonable doubt. To maintain that an objective standard governs could nullify the constitutionally mandated requirement of unanimity of verdict. Under any standard other than an individual juror's determination, would not "the doubt of a single juror in the face of eleven votes for conviction [be] * * * per se unreasonable?" [28]

Where a verdict of guilty is generated by the process of being influenced by a preliminary vote of the majority instead of subjective convincement beyond a reasonable doubt, at best we have a situation where two separate portions of the charge are at loggerheads; at worst, we have a serious question that the charge may have become constitutionally delinquent, in derogation of the defendant's traditional right of trial by jury.

We do not re-examine the constitutional question; in the view we take of this case, it does not become necessary to do so. The conviction will not be reversed for the dual reasons that first, the Allen Charge was incorporated into the body of the main charge and not used in its usual ominous context, that of a supplemental or "dynamite charge" [29] to blast a hung jury into a verdict. Secondly, the charge has heretofore been approved by this court, albeit grudgingly and in a somewhat restricted form. Nonetheless, its use has not been absolutely prohibited in this circuit.

■ After the most careful consideration of the Allen Charge and the context in which it was presented in this case, we have concluded that its use here was not so prejudicial as to deprive appellant of a fair trial and a unanimous verdict based on proof beyond a reasonable doubt.

Our refusal to reverse this conviction should not be taken to mean that we have tacitly approved of the Charge or that we intend, in the future, to ponder each case on its peculiar facts. On the contrary, we know from the experience in this circuit [30] and from an examination of

27. Billeci v. United States, *supra*. The distinction between the standards of proof demanded in civil and criminal cases had its origin in the latter part of the eighteenth century. The standard of proof beyond a reasonable doubt in criminal cases has become firmly entrenched in both the federal and the state courts. Wigmore on Evidence, Vol. IX, § 2497.

28. Moore's Federal Practice, Vol. 8, ¶ 31.-04, pp. 31–7.

29. Judge Wisdom referred to the Allen Charge as the "dynamite" charge in Green v. United States, 309 F.2d 852, 853 (5 Cir. 1962). He also points out that the charge is caustically referred to as the "third degree instruction" in Colorado, and the "shotgun instruction" in New Mexico. *Id.* at 854, footnote 1.

30. The Allen Charge was first approved in this circuit in Shaffman v. United States, 289 F. 370 (3 Cir. 1923). The experience of United States v. Meisch, 370 F.2d 768 (3 Cir. 1966), is persuasive evidence of the need to discontinue the Charge. In

*Meisch*, the trial court included the Allen Charge in its basic instructions to the jury, although the indictment contained but a single count. The case was not complicated. Only two witnesses were called. The jury did not ask for supplemental instructions. This court, speaking through Judge Ganey, admonished the lower court against the advisability of using the Allen Charge on re-trial: "Since the matter is to be remanded to the district court [on other grounds] and there may be a new trial, we think the trial judge who presides at that trial should omit any reference to the 'Allen Charge' unless the circumstances of the proof are much different from that of the first trial." 370 F.2d at 774.

Whether in *Meisch* we would have reversed and remanded solely on the basis of the erroneously given Allen Charge were there not other grounds to do so is problematical. What is important is that the use of the Allen Charge was, in that case, on facts substantially similar to the case at bar, condemned. Two years later,

the experience in others [31] that the use of the Allen Charge is an invitation for perennial appellate review. As the Arizona Supreme Court said when it abolished it in 1959:

> "When and wherever its use is called into question it must stand or fall upon the facts and circumstances of each particular case. It has given, and we believe each use will give us, harassment and distress in the administration of justice. No rule of thumb can circumscribe definite bounds of when and where, or under what circumstances it should be given or refused.
>
> \* \* \* \* \* \*
>
> "We are convinced that the evils far outweigh the benefits, and decree that its use shall no longer be tolerated and approved by this court." State v. Thomas, 86 Ariz. 161, 342 P.2d 197, 200 (1959).

Hereafter, in this circuit, trial judges are not to give instructions either in the main body of the charge or in the form of a supplement that direct a juror to distrust his own judgment if he finds a large majority of the jurors taking a view different from his. Such an instruction will be deemed error, normally reversible error. Conceivably, in very extraordinary circumstances the error may be found so inconsequential as to avoid the necessity of reversal on appeal. But hereafter this court will not let a verdict stand which may have been influenced in any way by an *Allen* Charge.

We predicate our decision on the basis of the potential for prejudice its future use may generate and the profound difficulty in confining its use within just and equitable bounds. Its peccancy comes from its tendency to hurt, from its tendency to erode the jurors' capacity for meaningful group deliberation with its concomitant arguing, influencing, and exchange of views. As a prophylactic device to eliminate future vexation, our prohibition shall have prospective application only in those jury trials which shall be conducted hereafter.[32]

The judgment of conviction will be affirmed.

---

from the same district court, it appears again.

31. See the dissenting opinion of Judge Wisdom in Andrews v. United States, 309 F.2d 127 (5 Cir. 1962): "The Allen Charge causes more trouble in the administration of justice than it is worth. Its time-saving merits in the district court are more than nullified by the complications it causes on appeal when the reviewing court must determine whether in the circumstances of a particular case the trial judge applied the charge properly—in substance and in timing, 'Like Banquo's ghost it will not remain at rest.' Justice Udall, dissenting in State v. Voeckell, 69 Ariz. 145, 210 P.2d 972 (1949). And in this Circuit the ghost seems especially .restless." See also Green v. United States, 309 F.2d 852 (5 Cir. 1962).

32. We suggest that if there is any disposition to instruct jurors to consult with others in the deliberative process, that trial judges use the following charge extracted from "Federal Jury Practice and Instructions," Mathes and Devitt, 1965, § 79.01:

> "It is your duty, as jurors, to consult with one another, and to deliberate with a view to reaching an agreement if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence in the case with your fellow jurors. In the course of your deliberations, do not hesitate to re-examine your own views, and change your opinion, if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict."