**UNITED STATES of America**

v.

**Calvin G. THOMAS, Defendant.**

**Crim. No. 91–37.**

United States District Court, W.D. Pennsylvania.

May 30, 1991.

Second Motion for Continuance Denied and Order Amended May 30, 1991.

---

B. Carlin, Asst. U.S. Atty., Pittsburgh, Pa., for plaintiff.

Philip Ignelzi, Pittsburgh, Pa., for defendant.

## MEMORANDUM OPINION

LEE, District Judge.

Before the Court are the Omnibus Pretrial Motions of the defendant filed out of time on May 13, 1991.

On May 22, 1991, a hearing was held on the defendant's Omnibus Pre-trial Motions and a Motion for a 90–day continuance for trial. On May 23, 1991, the Court entered an Order continuing the trial from May 28, 1991, to June 3, 1991, and directing the Government to disclose to the defendant all *Brady* and *Jencks* materials in its possession or control on or before May 31, 1991, at 10:00 a.m.

### Background

On March 20, 1991, the defendant was indicted on one count of conspiracy to steal, conceal and retain with intent to convert to own use government property and to transport same in interstate commerce in violation of 18 U.S.C. § 371, one count of interstate transportation of stolen property in violation of 18 U.S.C. § 2314, and three counts of theft of government property in violation of 18 U.S.C. § 641.

On April 3, 1991, pursuant to the motion of the defendant for extension of time to file pre-trial motions, the Court entered an Order extending the time for the filing of pre-trial motions for a period of 30 days to May 3, 1991. However, contrary to the Court's Order, the defendant did not file the Omnibus Pre-trial Motions until May 13, 1991.

Defendant's counsel explained that it was the intention of the defendant to request a 30–day extension beyond the initial 10–day period for the filing of the Pre-trial Motions, which would have made the filing timely.

The Court accepted the defendant's explanation and agreed to hear the Pre-trial Motions for disposition on the merits.

In support of his Motion for continuance, the defendant represented that defense counsel was continuously in trial from January 2, 1991, through April 16, 1991, that he took a vacation from April 29, 1991, to

May 8, 1991, and was scheduled to commence a criminal trial on May 30, 1991, in the Court of Common Pleas of Allegheny County, Pennsylvania, and therefore, required a continuance of 90 days to properly and effectively prepare for trial.

Because the parties were notified of the trial date as early as April 4, 1991, and because the Court found that the defendant had not adequately demonstrated due diligence in his preparation for trial, and further, in view of the Government's strenuous objection to a continuance,[1] the Court reluctantly agreed to continue the trial from May 28, 1991, to June 3, 1991.

Moreover, the Court directed the Government to contact the Personnel Office at Fort Meade, Maryland, John Gellagos, Fort Meade, Maryland, and Colonel Joseph Fisher of Evans City, Pennsylvania, identified by the Government as the persons who could identify military personnel who worked with the defendant at Fort Meade, Maryland, to request their cooperation in assisting defense counsel in his efforts to obtain the names and telephone numbers of the various witnesses.

In this Memorandum Opinion, the Court will treat the remaining matters raised in the defendant's Omnibus Pre-trial Motions.

### I. Motion for Disclosure of Federal Rule of Evidence 404(b) Evidence

■ The defendant requests that the Government "in the form of a proffer disclose any 404(b) evidence prior to eliciting any testimony or introducing Exhibits in connection with 404(b) evidence."

In response, the Government asserts that uncharged misconduct is not *Brady* material which must be disclosed. Moreover, the Government contends that because the Court must make a determination that such evidence is relevant for a purpose other than to show a mere propensity or disposition on the part of the defendant to commit a crime, and whether its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or possibility of misleading the jury, the Court can only make such a determination during the course of trial in the light of all of the evidence received up until the point that the Rule 404(b) evidence is offered.

The Government further agrees to request the Court to make a ruling on the admissibility of such evidence at the appropriate time during trial if the Government does decide to use such evidence.

Therefore, an Order will be entered directing the Government to request a ruling from the Court prior to its attempt to introduce such evidence during the trial of the case.

### II. Motion for Disclosure of Exculpatory Material and Additional Discovery Material

The defendant requests additional discovery items which basically seek discovery pursuant to Rule 16: (i) a list of names of the Government's witnesses; (ii) *Brady* material; (iii) handwritten notes of Special Agent Ziegler and Special Agent O'Neil; (iv) records of parts equipment and all persons involved in the redeployment phase of FC–88; and (v) witnesses' statements, including but not limited to Grand Jury testimony of any witness who was involved with the transportation of United States Army tractor tires referred to in Overt Act 9 of the Indictment.

#### Disclosure of Brady and Jencks Material

With regard to the defendant's request for various types of *Brady* material and the handwritten notes of Special Agent Ziegler and Special Agent O'Neil, the Court has already ordered the Government to disclose to the defendant all such material on May 31, 1991, at or before 10:00 a.m.

#### List of Witnesses

The defendant requests a list of the following witnesses:

(A) A list of the names and addresses of each and every person who was interviewed by the Government as a prospective, possible or potential witness for the trial in the above-captioned matter.

---

1. The Government represents that it has subpoenaed 23 witnesses for trial on May 28, 1991.

(B) A list of the names and addresses of each and every person who was interviewed by the Government in the course of its investigation into the above-captioned matter who the Government does not intend to call as a witness in its case in chief at trial.

(C) A list of the names and addressees of each and every expert who the Government intends to call as a witness in the presentation of its case in chief in the trial of the above-captioned matter.

(D) Names, addresses and telephone numbers for all persons involved in the redeployment phase of FC–88, including but not limited to the warrant officer in charge of the supply portion of FC–88, personnel of the First Army and the Directorate of Logistics (DSLOG) for the First Army Lt. Colonel Idiroldi.

The Court finds that the defendant has not established an appropriate basis for the compelled disclosure of the Government's witness list and therefore the said Motion will be denied. *Cf. Government of Virgin Islands v. Martinez*, 847 F.2d 125 (3d Cir. 1988).

### Witnesses' Statements

■ The defendant has moved for disclosure of "any inconsistent statements made by Government," and further, "witness statements including but not limited to Grand Jury testimony of any witness who was involved with the transportation of 9 United States Army "920" tractor tires referred to in overt act 9 of the indictment from Hopwood, PA to a disabled school bus located on property at 212A Dinner Bell Road, Farmington, PA."

To the extent that any witness' statement is *Jencks* or *Brady* material, the Court's Order of May 23, 1991, would require the disclosure of same on or before May 31, 1991, at 10:00 a.m. However, to the extent that the defendant seeks disclosure of statements that are not either *Jencks* or *Brady* material, the Court finds that the defendant is not entitled to any other statements, including statements of witnesses whom the Government does not plan to call at the trial of this case. *Cf. United States v. Fioravanti*, 412 F.2d 407 (3d Cir.1969), *cert. denied*, 396 U.S. 837, 90 S.Ct. 97, 24 L.Ed.2d 88 (1969); *United States v. Deerfield Specialty Papers, Inc.*, 501 F.Supp. 796 (E.D.Pa.1980); *United States v. Fischbach and Moore, Inc.*, 576 F.Supp. 1384 (W.D.Pa.1983).

### Books and Documents and Tangible Items

■ The defendant has requested the following records or documents:

(A) Any documentation which supports or establishes the value of the property alleged in the indictment including but not limited to purchase orders, receipts, inventory schedules, manuals, microfilm or computer generated data known as AMDF which places a value on all equipment purchased by the Department of Army.

(B) Any memorandum, directive, or order issued by the United States Department of Army on or about the early 1980's which was sent to all Army Reserve agencies permitting the return or turning in of excess or unauthorized stockage by marking the items "Found on Post."

(C) Any and all records of the shipments of equipment and repair parts during the redeployment phase of FC–88 for the period in or about June 1988 and continuing to in or about December 1988 from Ft. Meade to the 99th U.S. Army Reserve Command in Oakdale, Pennsylvania and its Area Maintenance Support activities located throughout Western Pennsylvania and West Virginia. This includes all inventory records maintained to identify the equipment and repair parts while at Ft. Meade and at the point of receipt by the 99th ARCOM and its AMSA's.

The Government will be directed to produce said documents and records because the Court finds that they are either (i) evidence material to the preparation of de-

fendant's case, or (ii) materials intended by the Government for use in its case in chief at trial.

### Reasons for Rulings

The Court finds that because of the Court ordering the production of the *Jencks* and *Brady* material prior to trial, together with the additional items set forth above, and because of the ordered cooperation of the Government in identifying witnesses, the defendant will be able to adequately prepare for trial.

Moreover, the Court notes that the Government agreed to disclose the plea bargain agreements of the co-defendants, Charles C. Copney and Wendell Ronald Charles, and in addition, the Court notes that defense counsel attended the change of plea hearings for those two defendants, during which the Government made a statement of facts to enable the Court to accept the pleas of guilty of those defendants.

Further, during the hearing on the defendant's Motion to suppress physical evidence, the Court ordered the Government to disclose the affidavit in support of the search warrant pursuant to which the tires were seized from a disabled school bus in Farmington, Pennsylvania. That affidavit contains information which the Government contends is *Jencks* material.

### III. Motion to Suppress Physical Evidence Seized

■ On August 27, 1990, at approximately 3:10 p.m., a special agent for the Department of Defense seized nine tires from a disabled school bus located at 212–A Dinner Bell Road, Farmington, Pennsylvania.

The defendant asserts that his investigation reveals that the tires were seized without a warrant.

The Government voluntarily produced the search warrant but declined to produce the affidavit in support of the warrant because the Government contends it contains *Jencks* material. After a review of the affidavit by the Court *in camera*, the Court ordered the disclosure of the affidavit to the defendant.

The Court finds that the warrant was properly issued.

Moreover, the Court finds that the defendant is without standing in that he does not have a legitimate expectation of privacy in either the school bus or the land on which it was located which items are owned by third parties and in which the defendant does not have a possessory interest. *U.S. v. Salvucci*, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980).

In any event, were we to assume the defendant to have standing, nevertheless, the defendant's Motion to suppress the physical evidence will be denied because the search was executed pursuant to a valid search warrant.

### IV. Motion to Suppress Defendant's Statement of June 30, 1989

The defendant contends that his statement given to Special Agent Paul Ziegler of the Department of Defense and Special Agent Frank O'Neil of the FBI on June 29, 1989, at the FBI offices in Pittsburgh, Pennsylvania, should be suppressed because (i) he was not given his *Miranda* rights before he made the statement in a custodial situation, and (ii) the statement is "the fruit of an unlawful seizure in violation of the Fourth Amendment" in that "the agents had insufficient probable cause to seize defendant Thomas at the time they questioned him in violation of the Fourth Amendment."

The Court makes the following Findings of Fact:

1. On June 29, 1989, Special Agent Paul Ziegler ("Ziegler") of the Department of Defense and Special Agent Frank O'Neil ("O'Neil") of the Federal Bureau of Investigation, who were conducting an investigation of the theft of Government property at Fort Meade, Maryland which commenced April 1989, contacted Richard Ondick, ("Ondick") a foreman employed by the Department of Army at the Greensburg, Pennsylvania AMSA Facility, and the defendant's supervisor.

2. Ondick had no objection to the defendant being interviewed during normal business hours and indicated that the defendant could use a Government vehicle to come to Pittsburgh, Pennsylvania, for that purpose.

3. Ondick stated that he would advise the defendant of the interview. However, Ziegler and O'Neil directed him not to talk to the defendant.

4. Ziegler then called the defendant and advised him that he was investigating the "diversion of government property and would like to talk to him." The defendant readily agreed to meet with him at the FBI offices in Pittsburgh, Pennsylvania, on June 30, 1989, but stated that he first wanted to check with Ondick. Ziegler responded that he had talked to Ondick and Ondick had no objection. Ziegler did not represent to the defendant that Ondick had ordered him to submit to the interview.

5. Upon his arrival at the FBI offices on June 30, 1989, at 10:00 a.m., and in accordance with the regular FBI procedure, the defendant received a visitor's identification card and was then conducted from the reception area to the interview room by O'Neil.

6. The interview room was approximately ten-by-ten, and contained a desk and three chairs.

7. Zeigler arrived at the FBI offices prior to the defendant and also received a visitor's identification card.

8. Prior to the commencement of the interview, the defendant was advised that he was not compelled to submit to the interview, but if he did and later wanted to refuse to answer questions at any time, he was free to do so, and further, he was advised that he was free to leave. The defendant acknowledged that he understood.

9. During the interview, the defendant was not coerced by either Ziegler or O'Neil in any way. He was not told, as contended by the defendant, that he was lying, that he had reached the top of the mound and can't get over the hill, that he would be charged with 40 felony counts, that he would go to jail as a result of the evidence and finally, that if he obtained a lawyer, the Government would play hardball and the defendant would be the one who would be hurt.

10. During the interview, the door was closed part of the time. At no time during the interview did either agent display any weapon.

11. Also during the interview, the defendant was offered a cup of coffee or a soft drink, but declined and requested a drink of water. The defendant was thereupon escorted by O'Neil to the fountain, again, in accordance with regular FBI procedure.

12. Ziegler is five foot, eight inches and weighs 170 pounds. The defendant is six foot seven inches and weighs approximately 250 pounds. O'Neil is five foot ten inches and weighs 160 pounds.

13. Subsequent to the commencement of the interview, the defendant was advised that he could have an attorney.

14. At the conclusion of the interview, the parties were cordial to each other. However, when requested by the agents to give a written statement, the defendant declined.

15. The agents did tell the defendant that theft of government property is a serious crime.

16. The defendant has been a member of the U.S. Army Reserve for approximately 23 years. His rank is presently that of Warrant Officer CW-3. The defendant is a high school graduate, and prior to working for the Government, was employed by the United States Steel Corporation as an apprentice electrician and motor inspector.

17. The defendant also served as a Deputy Constable in Fayette County, Pennsylvania, serving subpoenas for the District Attorney's Office and summons for a local District Justice. However, the defendant never made any arrests, nor was he ever trained in making arrests.

18. The defendant has no prior arrests or convictions.

19. At no time during the interview, did the defendant request assistance of counsel prior to giving any statement.

20. The defendant did not indicate a desire to speak to or have anyone notified.

21. The defendant did not request or demonstrate a desire to remain silent.

22. The interrogating officers did not make threats or promises to induce defendant to make any statement.

23. The interrogating agents did not use physical violence to procure the defendant's statement.

24. The defendant was alert and responsive to questions when giving his statement.

### Conclusions of Law

1. Prior to and at the time of the interview, the defendant was not at any time under arrest or restraint and at all times, was free to terminate the interview and leave the FBI offices.

2. At no time was the defendant threatened with arrest nor was he intimidated by the statements of the agents or the physical appearance of the interview room. *Cf. U.S. v. Antoon*, 933 F.2d 200 (3d Cir.1991).

■ 3. The questioning of the defendant by Ziegler and O'Neil was not a custodial interrogation requiring *Miranda* warnings and thus, his statement during the questioning is admissible at his trial.

4. The defendant's statement was voluntarily and intelligently given by him.

5. Under the totality of the circumstances, a reasonable person would have believed that he was not in custody, was not compelled to submit to the interview and was free to leave at any time. *Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984); *Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977); *U.S. v. Hocking*, 860 F.2d 769 (7th Cir.1988); *U.S. v. Calisto*, 838 F.2d 711 (3d Cir.1988); *U.S. v. Jonas*, 786 F.2d 1019 (11th Cir.1986).

■ 6. Because the defendant was neither under arrest nor in a custodial situation, as a reasonable person, he would have believed that he did not have to submit to the interview and was free to leave. Therefore, there is no violation of his Fourth Amendment rights. *California v. Hodari D.*, —— U.S. ——, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991).

### The Defendant's Motion for "Use Immunity"

■ Before testifying during the hearing on the Motions to suppress the physical evidence and the defendant's statement, the defendant requested the Court to confer "use immunity" on him pursuant to *Simmons v. U.S.*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).

The Court declined to confer "use immunity" on defendant in connection with his testimony during the pre-trial motions because the Court finds that the equivalent of such immunity is automatically conferred on him by *United States v. Salvucci*, 448 U.S. 83 at 92, 100 S.Ct. 2547 at 2553.

Obviously, the defendant seeks to prevent the use of that testimony to impeach him during the trial of the case. *Id.*, fn. 8, 448 U.S. at 93, 100 S.Ct. at 2554; *Woody v. U.S.*, 379 F.2d 130 (D.C.Cir.1967); *U.S. v. Gravatt*, 868 F.2d 585 (3d Cir.1989) at fn. 9.

The Court declines to confer such immunity because the defendant has failed to establish any extraordinary circumstances requiring such immunity to protect his rights. *Cf. Gravatt*, at 590. More importantly, the issue of the admissibility of such evidence to impeach the defendant at the trial of the case is a trial issue better decided at the time the Government may seek to introduce the defendant's prior testimony.

Therefore, an appropriate Order will be entered.

### ORDER OF COURT

AND NOW, this 30th day of May, 1991, after hearing on the defendant's Omnibus Pre-trial Motions, it is ordered as follows:

(1) The defendant's motion for a list of names and addresses of each and every person who was interviewed by the Govern-

ment as a prospective possible or potential witness at the trial in the above-captioned matter is denied.

(2) The defendant's motion for a list of names and addresses of each and every person who was interviewed by the Government in the course of its investigation into the above-captioned matter whom the Government does not intend to call as a witness in its case in chief at trial is denied.

(3) The defendant's motion for a list of names and addresses of each and every expert who the Government intends to call as a witness in the presentation of its case in chief in the trial of the above-captioned matter is denied.

(4) The defendant's motion for names, addresses and telephone numbers for all persons involved in the redeployment phase of FC–88 including but not limited to the warrant officer in charge of the supply portion of FC–88, personnel of the First Army and the Directorate of Logistics (DSLOG) for the First Army Lt. Colonel Idiroldi is denied.

(5) The defendant's motion for witness statements including but not limited to Grand Jury testimony of any witness who was involved with the transportation of 9 United States Army "920" tractor tires, referred to in overt act 9 of the indictment, from Hopwood, Pennsylvania, to a disabled school bus located on property at 212–A Dinner Bell Road, Farmington, Pennsylvania, is denied.

(6) The defendant's motion to suppress his statement of June 30, 1989, given to Special Agents Frank O'Neil and Paul Ziegler is denied.

(7) The defendant's motion to suppress the physical evidence seized on August 27, 1990, nine United States Army "920" tractor tires seized from 212–A Dinner Bell Road, Farmington, Pennsylvania, is denied.

(8) The defendant's motion for a severance is denied for the reason that his co-defendants have pleaded guilty.

(9) The defendant's motion for use immunity for his testimony during the hearing on the Omnibus Pre–Trial Motions is denied.

IT IS FURTHER ORDERED that on or before June 21, 1991, at 10:00 a.m., the Government is ordered to produce the following information in connection with its disclosure of *Brady* material:

(1) Any and all prior criminal record or other misconduct or bad acts attributed to Government witnesses;

(2) Any promises of immunity, plea bargains and/or other favorable treatment to any Government witness. This includes any and all consideration given to or on behalf of the witnesses or expected or hoped for by the witnesses. By consideration, the defendant refers to absolutely anything of value or use to a witness, or to persons of concern to the witness, including but not limited to, criminal civil or tax immunity grants, relief from forfeiture or disgorgement assistance or favorable treatment or recommendations with respect to any criminal, civil, tax court, court of claims, administrative or other legal dispute with the Government or any other parties, payments of monies or fees, provision of food, clothing, shelter, transportation or other like benefits, and anything else which could arguably reveal an interest or bias in the witness in favor of the Government or against the defendant or act as an inducement to testify or to color testimony.

(3) Any inconsistent statements made by Government witnesses.

The Government is ordered to include the following in its disclosure of the *Brady* material to the defendant:

(1) Any handwritten notes and typewritten memorandum by either Special Agent Frank O'Neil of the Federal Bureau of Investigation or Special Agent Paul C. Ziegler of the Defense Criminal Investigative Service of an interview of defendant Calvin G. Thomas conducted on June 30, 1989 at the Pittsburgh office of the Federal Bureau of Investigation and phone conversations with the Department

on July 17, August 23 and September 25, 1989.

On or before June 21, 1991, at 10:00 a.m., the Government is ordered to permit the defendant to have access to the following records or documents in its possession or control:

(1) Any documentation which supports or establishes the value of the property alleged in the indictment including but not limited to purchase orders, receipts, inventory schedules, manuals, microfilm or computer generated data known as AMDF which places a value on all equipment purchased by the Department of Army;

(2) Any memorandum, directive, or order issued by the United States Department of Army on or about the early 1980's which was sent to all Army Reserve agencies permitting the return or turning in of excess or unauthorized stockage by marking the items "Found on Post."

(3) Any and all records of the shipments of equipment and repair parts during the redeployment phase of FC–88 for the period in or about June 1988 and continuing to in or about December 1988 from Fort Meade to the 99th U.S. Army Reserve Command in Oakdale, Pennsylvania and its Area Maintenance Support activities located throughout Western Pennsylvania and West Virginia. This includes all inventory records maintained to identify the equipment and repair parts while at Fort Meade and at the point of receipt by the 99th ARCOM and its AMSA's.

If the Government intends to use evidence of defendant's misconduct, wrongs or acts which would fall within the purview of Federal Rule of Evidence 404(b), the Government is ordered to first request the Court's ruling on the admissibility of such evidence prior to the introduction of same.