EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| El Pueblo de Puerto Rico<br><br>Recurrido<br><br>v.<br><br>Edwin Alers De Jesús<br><br>Peticionario | Certiorari<br><br>2021 TSPR 56<br><br>206 DPR ____ |

Número del Caso:  CC-2020-629

Fecha: 23 de abril de 2021

Tribunal de Apelaciones:

     Panel V

Abogado de la parte peticionaria:

     Lcdo. Armando F. Pietri Torres

Materia:  Resolución del Tribunal con Voto Particular Disidente.

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| El Pueblo de Puerto Rico<br><br>Recurrido<br><br>v.<br><br>Edwin Alers De Jesús<br><br>Peticionario | CC-2020-0629 | Certiorari |
|---|---|---|

RESOLUCIÓN

En San Juan, Puerto Rico, a 23 de abril de 2021.

A la petición de certiorari, no ha lugar.

Lo acordó el Tribunal y certifica el Secretario del Tribunal Supremo. El Juez Asociado señor Estrella Martínez disiente del curso de acción de este Tribunal y emitió un Voto particular disidente. La Jueza Presidenta Oronoz Rodríguez emite la siguiente expresión:

"La Jueza Presidenta Oronoz Rodríguez disiente del proceder mayoritario y emite la expresión siguiente:

Bajo la óptica de nuestra estructura constitucional, en el Tribunal Supremo tenemos que impartir certeza jurídica a las controversias que inciden en los derechos fundamentales de las personas de nuestra jurisdicción. Era imperativo resolver si, a la luz del ordenamiento jurídico puertorriqueño, procede o no la retroactividad del requisito fundamental de la unanimidad de los veredictos en juicios por jurado en casos que hayan advenido finales y firmes. Precisaba, de una vez, eliminar el limbo jurídico que esta controversia impone a la población correccional.

Ante el carácter novel y la diversidad de fundamentos jurídicos que atañen a esta controversia, hubiese expedido y recomendado la celebración de una vista oral, así como la intervención de distintos sectores de la

comunidad jurídica como *amicus curiae* para ilustrar a este Tribunal sobre las implicaciones y repercusiones que podría tener para nuestro ordenamiento la adopción de una u otra norma.

Lamento que este Tribunal claudique su deber como máximos intérpretes de la Constitución y garantes de los derechos fundamentales que cobijan a todas las personas".

El Juez Asociado señor Colón Pérez emite la siguiente expresión:

"El Juez Asociado señor Colón Pérez disiente del curso de acción seguido por una mayoría de este Tribunal en la causa de epígrafe. Ello, por entender que al igual que el Tribunal Supremo de los Estados Unidos está atendiendo el recurso de *Edwards v. Vannoy*, No. 19-5807, esta Curia debió expedir el caso de marras a los fines de pautar el derecho aplicable bajo la Constitución del Estado Libre Asociado de Puerto Rico, Const. ELA, LPRA, Tomo 1, y la Constitución de los Estados Unidos de América, Const EE.UU., LPRA, Tomo 1, a aquellos escenarios en los que se invoque la aplicación retroactiva -- en casos finales y firmes -- de la norma pautada en *Ramos v. Lousiana*, 590 US ___ (2020) y *Pueblo v. Torres Rivera*, 204 DPR 288 (2020), respecto al requisito de unanimidad en los veredictos de culpabilidad."

José Ignacio Campos Pérez
Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| El Pueblo de Puerto Rico | | |
|---|---|---|
| Recurrido | | |
| v. | CC-2020-0629 | Certiorari |
| Edwin Alers De Jesús | | |
| Peticionario | | |

Voto particular disidente emitido por el Juez Asociado señor ESTRELLA MARTÍNEZ

San Juan, Puerto Rico, a 23 de abril de 2021.

Este caso representaba un escenario idóneo para definir el alcance y la aplicación de la nueva exigencia constitucional sobre el veredicto unánime de culpabilidad del jurado en nuestra jurisdicción. Particularmente, su efecto en aquellos casos ya finales y firmes. Sin embargo, la Mayoría de este Tribunal declinó adentrarse en este asunto de gran envergadura para nuestro sistema jurídico penal. Por tal razón, me veo obligado a plasmar mi postura y explicar los cimientos de la misma.

I

Por hechos ocurridos el 4 de enero de 2008, el Sr. Edwin Alers De Jesús (señor Alers De Jesús o peticionario) fue acusado por los Artículos 401 y 405 de la Ley de Sustancias Controladas, Ley Núm. 4 de 23 de junio de 1971, 24 LPRA sec. 2404 et seq. Tras la celebración del juicio por jurado, el

señor Alers De Jesús fue declarado culpable por ambos delitos. En lo pertinente, **la votación de los miembros del Jurado fue por mayoría, mas no por unanimidad, a saber: nueve (9) a tres (3)**. Así, el 21 de junio de 2012, el tribunal sentenció al peticionario. Tal sentencia advino final y firme.

A raíz de lo resuelto el pasado año en los casos de Ramos v. Louisiana, infra, y Pueblo v. Torres Rivera, infra, sobre la exigencia constitucional de veredicto unánime de culpabilidad, el señor Alers De Jesús solicitó la celebración de un nuevo juicio. Ello, con el fin de beneficiarse de tal protección constitucional, pues el veredicto de culpabilidad emitido por el jurado en su contra no fue unánime.[1]

Al evaluar el planteamiento del señor Alers De Jesús, el Tribunal de Primera Instancia razonó que se trataba de un caso final y firme, por lo que no procedía la aplicación retroactiva de la norma constitucional invocada. Por consiguiente, denegó la petición del nuevo juicio.

En desacuerdo, el señor Alers De Jesús acudió al Tribunal de Apelaciones, el cual denegó la expedición de su recurso.[2] Con fundamentos muy similares a los empleados por el foro primario, el tribunal apelativo intermedio entendió que la solicitud de nuevo juicio del señor Alers De Jesús era

---

[1] El tribunal ordenó al Ministerio Público fijar su postura sobre tal solicitud, pero no compareció.

[2] El Sr. Edwin Alers De Jesús presentó un recurso de apelación, pero fue acogido por el Tribunal de Apelaciones como un certiorari.

improcedente. Particularmente, concluyó que la nueva normativa constitucional no era de aplicación por el hecho de que su sentencia ya había advenido final y firme.

Aún inconforme, el señor Alers De Jesús presentó un recurso de <u>certiorari</u> ante este Alto Foro. En su recurso, nos invita a reconocer la aplicación retroactiva de la nueva norma de índole constitucional que incluye el requisito de veredicto unánime de culpabilidad como parte del derecho fundamental al juicio por jurado. A tales efectos, particulariza que, al haber sido encontrado culpable por un veredicto de pluralidad, "está cumpliendo [una] pena de reclusión bajo reglas de juego que fueron declaradas inconstitucionales".

No obstante, ante este escenario, la Mayoría de este Tribunal opta por denegar el recurso del señor Alers De Jesús y, con ello, la oportunidad de reconocerle la protección constitucional que le cobija. Por no coincidir con tal proceder, disiento.

A continuación, los fundamentos de derecho que amparan mi disenso.

**II**

**A.**

La Sexta Enmienda de la Constitución de los Estados Unidos reconoce expresamente el derecho de todo acusado a ser juzgado por un jurado imparcial. Enmda. VI, Const. EE.UU., LPRA, Tomo 1. De igual modo, la Constitución de Puerto Rico reconoce tal derecho. Art. II, Sec. 11, Const.

PR, Tomo 1. Ello implica que todo acusado o acusada tiene derecho a que la prueba que se presente en su contra sea evaluada y adjudicada por un grupo imparcial de sus pares con el fin último de impregnar el juicio criminal de imparcialidad.

Así lo ha expresado el Tribunal Supremo de Estados Unidos:

> A right to jury trial is granted to criminal defendants in order to prevent oppression by the Government. Those who wrote our constitutions knew from history and experience that it was necessary to protect against unfounded criminal charges brought to eliminate enemies and against judges too responsive to the voice of higher authority. The framers of the constitutions strove to create an independent judiciary but insisted upon further protection against arbitrary action. Providing an accused with the right to be tried by a jury of his peers gave him an inestimable safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge. Duncan v. State of Louisiana, 391 US 145, 155-156 (1968).

Sin embargo, a pesar de que la Constitución de Estados Unidos reconoce categóricamente el derecho a juicio por jurado, no fue hasta el año 1968, en Duncan v. State of Louisiana, supra, que el mismo fue elevado a rango fundamental y, en consecuencia, exigible ante los estados.

Asimismo, aun cuando a nivel federal se consideraba el voto unánime del jurado como parte de tal derecho constitucional, varios estados, como Louisiana y Oregon, al igual que Puerto Rico, mantenían en sus respectivas jurisdicciones la votación del jurado por mayoría. En el pasado, el Tribunal Supremo de Estados Unidos validó tal

práctica estatal al no considerar el veredicto unánime de culpabilidad como parte de un derecho fundamental. Apodaca v. Oregon, 406 US 404 (1972); Johnson v. Louisiana, 406 US 356 (1972).[3]

Ahora bien, tal razonamiento tuvo fin con la decisión de Ramos v. Louisiana, 590 US ___ (2020). Allí, el Tribunal Supremo de Estados Unidos determinó que el veredicto unánime de culpabilidad era parte esencial del derecho constitucional a un juicio imparcial, por lo que tenía que aplicarse a los estados mediante la Decimocuarta Enmienda del debido proceso de ley.[4] En su análisis, el Alto Foro federal reconoció que la concepción de la votación por mayoría en los únicos dos (2) estados donde se practicaba tenía arraigos discriminatorios de índole racial.

**B.**

En Puerto Rico, no fue hasta principios del siglo pasado que se incorporó el juicio por jurado en casos criminales.

---

[3]Bajo ese entendido, este Tribunal resolvió que la unanimidad en el veredicto no era un derecho fundamental oponible a los estados y territorios. Pueblo v. Casellas Toro, 197 DPR 1003 (2017).

[4]La Corte Suprema Federal identificó la controversia ante sí de la siguiente manera: "[w]e took this case to decide whether the Sixth Amendment right to a jury trial —as incorporated against the States by way of the Fourteenth Amendment— requires a unanimous verdict **to convict a defendant of a serious offense**". (Énfasis suplido). Ramos v. Louisiana, 590 US ___ (2020). La opinión mayoritaria, haciendo un análisis de la Sexta Enmienda, en específico del término *trial by an impartial jury*, concluyó que dicho término exige el requisito de la unanimidad para un veredicto de culpabilidad. En ese mismo párrafo concluyen que "a jury must reach a unanimous verdict in order *to convict*". Íd.

Pueblo v. Narváez Narváez, 122 DPR 80 (1988). "Esta institución, ajena a nuestra tradición civilista, proviene del sistema de derecho común anglosajón [y] nos llega a través de Estados Unidos". Íd., pág. 84.

Como cuestión de hecho, la Ley Foraker y la Ley Jones guardaban silencio sobre la institución del jurado, por lo que ésta fue implementada en nuestra jurisdicción a través de legislación en el año 1901. J. Trías Monge, Historia constitucional de Puerto Rico, Vol. III, Editorial de la Universidad de Puerto Rico (1982), pág. 194; Ley estableciendo el juicio por jurado en Puerto Rico de 12 de enero de 1901.

Por su parte, la Ley sobre procedimientos en los juicios por jurado de 31 de enero de 1901, disponía que el jurado sería un cuerpo de doce (12) hombres elegidos de entre los habitantes de un determinado distrito, los cuales serían revestidos de poder para conocer como Juez en cuestiones de hechos. En específico, la Sección 2 exigía que los doce (12) hombres estuvieran unánimemente conformes en cualquier veredicto que emitiesen. Asimismo, ello fue incorporado en el Código de Enjuiciamiento Criminal de 1902:

> Art. 185- Un jurado constará de doce hombres que deben estar **unánimemente** conformes en cualquier veredicto que dicte. (Énfasis suplido).

Como puede verse, en nuestra jurisdicción, la institución del jurado inició con un requisito de unanimidad en los veredictos.

Ahora bien, no fue hasta el año 1948 que se introdujo el veredicto por mayoría en nuestra jurisdicción,[5] lo cual fue posteriormente elevado a rango constitucional en el año 1952. E.L. Chiesa Aponte, Derecho procesal penal de Puerto Rico y Estados Unidos, Ed. Forum, 1992, Vol. II, pág. 285. Así, se enmendó el Artículo 185 del entonces Código de Enjuiciamiento Criminal de Puerto Rico para que leyera:

> Art. 185- En todos los casos en que, conforme a las leyes de Puerto Rico, un jurado deba rendir un veredicto, dicho veredicto será por acuerdo de no menos de tres cuartas partes (3/4) del jurado.

Tal cambio en nuestro ordenamiento jurídico no fue casualidad, sino que constituyó una reacción a la realidad que vivía nuestra sociedad en aquel entonces. Es decir, entre los años 1947 y 1952, se maquinaron estos cambios para lamentablemente facilitar la persecución por ideologías políticas. El aumento en la actividad nacionalista, a partir del regreso de Don Pedro Albizu Campos, motivó limitaciones al derecho a juicio por jurado como lo sería la permisión de veredictos por mayoría. J. Trías Monge, op. cit., pág. 194. "No requerir unanimidad era parte de esa corriente: no se quería que se 'colaran' algunos disidentes en los jurados que obstaculizaran la voluntad de la mayoría política del momento". J. Fontanet, La unanimidad entre racistas y carpeteros, El Nuevo Día, 3 de mayo de 2020. De este modo, los veredictos por mayoría sirvieron para obtener convicciones contra líderes del Partido Nacionalista de

---

[5]Ley Núm. 11 del 19 de agosto de 1948.

Puerto Rico que abogaban por el derrocamiento del Gobierno de Puerto Rico. C. Noriega, El Derecho a juicio por jurado en Puerto Rico, 11 Rev. Jur. UIPR 15, 28 (1976).

Como consecuencia de tal realidad social, todo el proceso de elaborar la Constitución y el Estado Libre Asociado de Puerto Rico estuvo políticamente viciado por la persecución desatada contra los grupos independentistas. I. Acosta, La Mordaza, Editorial Edil, Inc., Rio Piedras, 1989, pág. 235.

De inicio, el derecho a juicio por jurado no estaba contemplado para ser incluido en la Constitución, sino que meramente se trataba de un asunto legislativo. La delegación socialista fue quien defendió vigorosamente este derecho, al punto que logró que el juicio por jurado formara parte de nuestra Constitución. J., Trías Monge, op. cit., pág. 194. Sin embargo, no se logró imponer la unanimidad como así lo pretendía la delegación socialista.

> Contrario a la posición socialista, que favorecía los veredictos por acción unánime de los jurados, se dispuso, no obstante, que los veredictos podrían rendirse por no menos de nueve [9] jurados, dejando libre a la Asamblea Legislativa a requerir un número mayor de votos, o la unanimidad, si así lo deseaer más tarde. Las mismas razones que llevaron en 1948 a legalizar los veredictos por mayoría impidieron que la delegación popular aceptase en su totalidad la propuesta socialista. Íd.[6]

---

[6]Del Diario de Sesiones de la Convención Constituyente se desprende que hubo un intento por no plasmar el asunto de la votación mayoritaria en la Constitución, de modo que fuera un asunto delegado a la Asamblea Legislativa. La respuesta a ello fue la siguiente:
Sr. BENITEZ: Con relación a la enmienda del compañero Fonfrías quiero decir que nuestro temor ha sido el de que,

Finalmente, el lenguaje aprobado en la Constitución de Puerto Rico lee como sigue:

> En los procesos por delito grave el acusado tendrá derecho a que su juicio se ventile ante un jurado imparcial compuesto por doce vecinos del distrito, **quienes podrán rendir veredicto por mayoría de votos en el cual deberán concurrir no menos de nueve**. (Énfasis suplido). Art. II, Sec. 11, Const. PR, Tomo 1.

Desde ese entonces, varios juristas han defendido el restablecimiento del requisito de la unanimidad en el veredicto de culpabilidad, ya que éste "enaltece el principio supremo de la duda razonable, le exige al jurado deliberar con mayor interés, profundidad, detenimiento y responsabilidad y porque propende a que la justicia se dispense sin prejuicio, sin pasión y sin premura". R. Cardona Ubiñas, Veredicto por unanimidad, Claridad, 28 de abril de 2020, https://www.claridadpuertorico.com/veredicto-por unanimidad/ (última visita 9 de octubre de 2020).

### C.

Como mencioné, tan reciente como el pasado año, el Tribunal Supremo de Estados Unidos reconoció que la unanimidad en el veredicto de culpabilidad de un jurado forma parte del derecho fundamental a un juicio por jurado

---

sobre la base de la jurisprudencia establecida en lo que toca a la expresión "juicio por jurado" en el derecho anglosajón, el concepto de "juicio por jurado" quiere decir "juicio por jurado con veredicto unánime." De suerte que acceder a la enmienda que propone el compañero Fonfrías sería sacarle mucho más de manos de la [Asamblea] Legislativa porque entonces quedaría, con arreglo a esta jurisprudencia, fijado indefectiblemente en doce el número de jurados que habrían de coincidir. Íd., pág. 1940 (versión digital).

imparcial, por lo que elevó igualmente ese requisito a uno de naturaleza fundamental. Ramos v. Louisiana, supra.

Por tratarse de un derecho fundamental, este nuevo requisito constitucional se extiende y aplica a los estados y a Puerto Rico. Así fue reconocido en Pueblo v. Torres Rivera, 2020 TSPR 42, 204 DPR __ (2020), en el cual implementamos por primera vez tal requisito constitucional en nuestra jurisdicción. Ahora bien, en esa ocasión, nos limitamos a reconocer su aplicación a casos que aún no fuesen finales y firmes por ser esa la controversia que teníamos ante nuestra consideración. Ello, distinto al caso de autos, el cual exige que nos expresemos en torno a la aplicabilidad de esta nueva norma constitucional a un caso final y firme.

### D.

Como premisa general, una **nueva** norma constitucional de carácter penal se aplica retroactivamente a todos los casos que al momento de su adopción no hubieran advenido finales y firmes. Griffith v. Kentucky, 479 US 314 (1987).("We therefore hold that a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exceptions for cases in which the new rule constitutes a clear break with the past".) Este principio ha sido reconocido y aplicado en nuestra jurisdicción en numerosas ocasiones. Véase, Pueblo v. González Cardona, 153 DPR 765, 771 (2001); Pueblo v. Guerrido López, 179 DPR 950 (2010); Pueblo v. Thompson Faberllé, 180 DPR 497, 505 (2010);

Pueblo v. Santos Santos, 185 DPR 709 (2012); Pueblo v. Torres Irizarry, 199 DPR 11 (2017); Pueblo v. Torres Rivera, supra.

Ahora bien, esta norma general federal tiene ciertas excepciones que permiten la aplicación retroactiva de la nueva regla a casos finales y firmes. Para ello, debemos referirnos a los parámetros plasmados en Teague v. Lane, 489 US 288 (1989). En ese caso, aun cuando se reiteró que la norma general era la no retroactividad a casos ya finales y firmes, se reconocieron dos (2) excepciones que sí lo permiten.[7] Tales excepciones son fundamentales para la controversia que tenemos ante nuestra consideración.

En Teague v. Lane, supra, el Máximo foro federal delineó la fórmula para determinar la retroactividad de una norma penal. La doctrina se resume como sigue:

> In Teague and subsequent cases, we have laid out the framework to be used in determining whether a rule announced in one of our opinions should be applied retroactively to judgments in criminal cases that are already final on direct review. Under the Teague framework, an old rule applies both on direct and collateral review, but a new rule is generally applicable only to cases that are still on direct review. A new rule applies retroactively in a collateral proceeding only if (1) the rule is substantive or (2) the rule is a "'watershed rul[e] of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding." (Citas omitidas). Whorton v. Bockting, 549 US 406, 416 (2007).

---

[7]En Teague v. Lane, 489 US 288 (1989), la Corte Suprema de los Estados Unidos se apartó de su precedente Linkletter v. Walker, 381 US 618 (1965), a los fines de darle mayor uniformidad a la norma de retroactividad. ("Application of the Linkletter standard led to the disparate treatment of similarly situated defendants on direct review.")

Así, de ordinario, una nueva norma aplicará sólo a los casos que estén pendientes ante los tribunales, entiéndase, que no son finales y firmes. Welch v. US, 578 US ___, 136 S.Ct. 1257 (2016) ("Under Teague, as a general matter, 'new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced'.")

Ahora bien, acorde con la doctrina federal antes resumida, la norma general tiene dos (2) excepciones. La primera es que una nueva regla penal de carácter constitucional declarada jurisprudencialmente sí podrá tener efecto retroactivo a casos finales y firmes si se clasifica como una regla sustantiva. Íd.; Schriro v. Summerlin, 542 US 348, 351 (2004). Una regla es sustantiva si incide en la conducta a ser penalizada o en la clasificación de personas que serán castigadas por ese estatuto penal. Íd. ("A rule is substantive rather than procedural if it alters the range of conduct or the class of persons that the law punishes.") Dicho de otro modo: "rules forbidding criminal punishment of certain primary conduct, as well as 'rules prohibiting a certain category of punishment for a class of defendants because of their status or offense'." Montgomery v. Louisiana, 577 US___, 136 S.Ct. 718, 728 (2016) . En ese sentido, las reglas sustantivas se diferencian de las reglas procesales debido a que estas últimas "regulate only the manner of determining the defendant's culpability." Welch v. US, supra.

La segunda excepción a la norma de retroactividad lo son las reglas procesales clasificadas como watershed. Por tanto, estas reglas también podrían tener efecto retroactivo, aunque los casos hayan advenidos finales y firmes. Estas son reglas procesales que implican "the fundamental fairness and accuracy of the criminal proceeding." Íd.; Schriro v. Summerlin, supra. Así, para clasificar una regla procesal como watershed, tienen que estar presentes los siguientes requisitos: (1) la regla tiene que ser necesaria para prevenir "an 'impermissibly large risk' of an inaccurate conviction", y (2) la regla debe "alter our understanding of the bedrock procedural elements essential to the fairness of a proceeding." Whorton v. Bockting, supra, pág. 418.

Un ejemplo de lo que se ha considerado un watershed rule bajo el esquema federal lo es Gideon v. Wainwright, 372 US 335 (1963). Íd., pág. 407. En ese caso, el Tribunal Supremo federal aplicó a un recurso de habeas corpus la nueva norma allí reconocida y extendió a los estados el derecho a asistencia de abogado como un derecho fundamental y parte esencial de un juicio justo. ("The right of one charged with crime to counsel may not be deemed fundamental and essential to fair trials in some countries, but it is in ours. From the very beginning, our state and national constitutions and laws have laid great emphasis on procedural and substantive safeguards designed to assure fair trials before impartial tribunals in which every defendant stands equal before the law.").

Así, según adelanté en mi expresión concurrente en Pueblo v. Torres Rivera, supra, para efectos de evaluar la retroactividad de una nueva norma constitucional, más allá de la etapa procesal en la que se encuentren los casos, se debe evaluar su contenido. Si la norma es sustantiva o watershed, se aplicará a todos los casos, independientemente hubiesen advenido finales y firmes. Por el contrario, si fuese una norma únicamente procesal, solo se aplicaría a los casos pendientes de revisión ante los distintos tribunales.

Con tal panorama, los tribunales estamos obligados a evaluar, en primer lugar, si la nueva norma constitucional es de naturaleza sustantiva, procesal o watershed, de modo que estemos en posición de determinar el alcance de su retroactividad. Dependiendo de tal ejercicio, es que se podrá aplicar correctamente su alcance.[8]

---

[8]En Ramos v. Louisiana, supra, por voz del Juez Gorsuch, se reconocen las excepciones al postulado general de que la retroactividad de nuevas normas jurisprudenciales penales de carácter constitucional se extiende únicamente a casos pendientes ante los tribunales. Así, reconociendo la posibilidad de que la nueva norma constitucional allí pautada pudiera extenderse a casos ya finales y firmes. Íd., pág. 24 (Gorsuch, J. Op.) ("Under Teague v. Lane, [489 US 288 (1989),] newly recognized rules of criminal procedure do not normally apply in collateral review. True, Teague left open the possibility of an exception for "watershed rule" the watershed doctrine, a new due process right applies to final convictions only when that protection manifestly improves the accuracy of convictions and does no less than "alter our understanding of the bedrock procedural elements." The retroactive application of these so-called watershed rules benefits not only defendants facing trial or appealing guilty verdicts, but also those who have exhausted their appeals. A defendant whose conviction and sentence has become final can invoke this doctrine in any habeas proceeding or other suit for post-conviction relief. When backdating that due process reform casts doubt on whether a prisoner's guilty verdict

**E.**

Reconozco que es una realidad que el Tribunal Supremo de Estados Unidos ha aplicado de manera muy restrictiva la excepción del <u>watershed rule</u>. Esta visión e interpretación restrictiva se debe a la importancia conferida a ciertos principios, como la deferencia a las cortes estatales y a la finalidad de sus sentencias. **"The real problem with the application of the Teague doctrine rests in its favoring of the principles of finality and comity over the values of fundamental fairness and equality under the law."** (Énfasis suplido). W. Berry III, Normative retroactivity, 19 U. Pa. J. Const. L. 485, 513 (2016). Tal interpretación ha generado múltiples críticas por convertir la excepción del watershed rule en una prácticamente inoperante en la esfera federal.[9]

---

was accurate or whether his trial" "implicat[ing] the fundamental fairness [and accuracy] of the trial.").

[9]Según lo expresaron los Jueces Anderson y Page en su disidencia en el caso Danforth v. State, 761 N.W. 2d 493, 500-501 (2009), de la Corte Suprema de Minnesota:

The policy interests of finality and uniformity addressed by Teague are important, but I conclude that the Supreme Court has applied the Teague rule so narrowly and strictly that many cases involving constitutional safeguards that warrant collateral review have not or will not receive such review. Unlike the majority, I conclude that the fact there have been no "watershed" rules announced by the Court in the 19 years since it decided Teague sends a signal that the Teague test as applied by the Court is "unyielding or unworkable." I acknowledge that Teague may be more workable and applicable in the context of preventing excessive interference by federal habeas courts in their review of state court decisions. **Nevertheless, when reviewing state criminal convictions, we should not limit our discretion in deciding retroactivity so narrowly.** We should recognize the Court's acknowledgment that Teague is designed to address federal concerns and accept the Court's invitation to formulate our own rule to suit our own needs. (Énfasis suplido).

No obstante, ante esa realidad, es menester reconocer que estamos facultados para desligarnos de tal interpretación limitada. Sin embargo, en la controversia ante nos, se satisface el esquema de Teague, máxime al analizar la institución del jurado conforme a nuestro ordenamiento jurídico, incluyendo los principios y los derechos fundamentales reconocidos por la Constitución de Puerto Rico.

Sabido es que la aplicabilidad de un derecho constitucional federal constituye sólo el ámbito mínimo de ese derecho. Ello, pues en el derecho constitucional norteamericano, el Tribunal Supremo de Estados Unidos establece el estándar mínimo de los derechos que tienen que garantizar los demás tribunales de la nación. L. Rivera Román, Los derechos de los acusados en los procedimientos penales bajo la Constitución de Puerto Rico y los Estados Unidos, 46 Rev. Jur. UIPR 417, 421 (2012).

Por tal razón, el Tribunal Supremo de un estado, incluyendo a Puerto Rico, puede interpretar su Constitución para darle a un derecho un ámbito de protección mayor, lo que puede redundar en una garantía más abarcadora que la reconocida por la Constitución federal. Pueblo v. Díaz, Bonano, 176 DPR 601, 621 (2009). Así, el alcance de una cláusula federal, aplicable a Puerto Rico, es lo mínimo a lo que están obligados los tribunales de la Isla. E.L. Chiesa Aponte, Derecho procesal penal de Puerto Rico y Estados Unidos, Ed. Forum, Vol. I, 1991 pág. 39. Al proveer únicamente el contenido mínimo, la Corte Suprema federal no

tiene ante sí los principios constitucionales y estatutarios propios de nuestro ordenamiento jurídico, los que precisamente nos permiten ampliar la protección e interpretación de tal contenido mínimo. Véase, Pueblo v. Ferrer Maldonado, 201 DPR 974 (2019) (Opinión disidente del Juez Asociado Estrella Martínez). De una manera más simple: podemos dar más, pero no menos.

Por ende, la norma federal de retroactividad antes resumida no impide que un estado o Puerto Rico pueda ampliar el alcance de tal retroactividad; lo que no podría hacer es reducir su alcance. Entiéndase, un estado no se puede negar a aplicar retroactivamente una nueva norma constitucional si así lo exige la doctrina; pero si, por el contrario, la doctrina no exige tal retroactividad, los estados sí podrían adoptarla en sus respectivas jurisdicciones. Esto, no sólo por la doctrina del contenido mínimo, sino porque así lo ha reconocido expresamente el Tribunal Supremo de Estados Unidos.

Precisamente, en Danforth v. Minnesota, 552 US 264 (2008), el Tribunal Supremo aclaró que el esquema de Teague no limita la autoridad de las cortes estatales para ampliar esta doctrina de retroactividad, lo que implica que los estados pueden ofrecer mayor retroactividad que la ofrecida a nivel federal. ("A close reading of the Teague opinion makes clear that **the rule it established was tailored to the unique context of federal habeas and therefore had no bearing on whether States could provide broader relief in their own**

**postconviction proceedings than required by that opinion.**")

A tales efectos, expresó:

> In sum, the Teague decision limits the kinds of
> constitutional violations that will entitle an
> individual to relief on federal habeas, but
> does not in any way limit the authority of a
> state court, when reviewing its own state
> criminal convictions, to provide a remedy for
> a violation that is deemed "nonretroactive"
> under Teague. Íd.

Es por ello que varios tribunales supremos estatales han adoptado en sus respectivas jurisdicciones unas interpretaciones más abarcadoras sobre las excepciones de Teague.[10] En ese sentido, algunos tribunales "inflate Supreme Court doctrine by retroactively apply[ing] new procedural rules in ways that manifestly diminish Teague's exacting requirements". D. Fox and A. Stein, Constitutional Retroactivity in Criminal Procedures, 91 Wash. L. Rev. 463, 494 (2016).

A modo de ejemplo, en Colwell v. State, 118 Nev. 807 (2002), la Corte Suprema de Nevada, reconoció la aplicación de las excepciones de Teague, más dio una interpretación más abarcadora a los criterios de un watershed rule. En específico, estableció que "we do not distinguish a separate requirement of 'bedrock' or 'watershed' significance: if accuracy is seriously diminished without the rule, the rule is significant enough to warrant retroactive application."

---

[10]Para ejemplos de casos estatales en los que se clasificó una norma como watershed rule y así se aplicó retroactivamente, véase: Talley v. State, 640 S.E.2d 878 (2007); State v. Zuniga, 444 S.E.2d 443 (1994).

En consecuencia, la pregunta a hacerse es: "did it establish a procedure without which the likelihood of an accurate conviction is seriously diminished?" Íd.

La decisión de apartarse de la interpretación del Tribunal Supremo de Estados Unidos se ancló en el siguiente análisis:

> Teague is not controlling on this court, other than in the minimum constitutional protections established by its two exceptions. In other words, we may choose to provide broader retroactive application of new constitutional rules of criminal procedure than Teague and its progeny require. The Supreme Court has recognized that states may apply new constitutional standards "in a broader range of cases than is required" by the Court's decision not to apply the standards retroactively. As the Oregon Supreme Court has stated: "we are free to choose the degree of retroactivity or prospectivity which we believe appropriate to the particular rule under consideration, so long as we give federal constitutional rights at least as broad a scope as the United States Supreme Court requires." Íd. págs. 817-818.

> A lo anterior, añadió que:

> We appreciate that strictly constraining retroactivity serves the Supreme Court's purpose of circumscribing federal habeas review of state court decisions, but as a state court we choose not to bind quite so severely our own discretion in deciding retroactivity. We therefore choose to adopt with some qualification the approach set forth in Teague. **We adopt the general framework of Teague, but reserve our prerogative to define and determine within this framework whether a rule is new and whether it falls within the two exceptions to nonretroactivity (as long as we give new federal constitutional rules at least as much retroactive effect as Teague does).** (Énfasis suplido).[11]

---

[11]El Tribunal Supremo de Connecticut en Casiano v. Commissioner of Correction, 317 Conn. 52 (2015), determinó que la entonces nueva norma de Miller v. Alabama, 567 US 460 (2012), era un watershed rule, aplicándola así

Por otra parte, la Corte Suprema de Delaware clasificó los parámetros para imponer las penas de muertes como un watershed rule y aplicó su nueva norma de manera retroactiva a los casos finales y firmes. Powell v. Delaware, 153 A.3d 69 (2016). Específicamente, la nueva norma exigía que los necessary findings fueran determinados por un jurado unánime y más allá de duda razonable. Así, la Corte Suprema de Delaware razonó que el cambio en el estándar de la prueba incidía en la noción de lo que es un fundamental fairness y en la certeza del fallo de culpabilidad. Por consiguiente, resolvió que requería una aplicación retroactiva a todos los casos, incluidos los finales y firmes.

Por otro lado, incluso la Corte Suprema de Minnesota advirtió que:

---

retroactivamente en su jurisdicción. A tales efectos, razonó que "[i]f failing to consider youth and its attendant characteristics creates a risk of disproportionate punishment in violation of the eighth amendment, then the rule in Miller assuredly implicates the fundamental fairness of a juvenile sentencing proceeding because it is a 'basic precept of justice' that punishment must be proportionate 'to both the offender and the offense'." Íd., págs. 70-71. Asimismo, agregó que: "In other words, our understanding of the bedrock procedural element of individualized sentencing was altered when the court intertwined two strands of its eighth amendment jurisprudence to require consideration of new factors for a class of offenders to create a presumption against a particular punishment." Íd.

Aun cuando, posteriormente, en Montgomery v. Louisiana, 577 US___, 136 S.Ct. 718, 728 (2016) , el Tribunal Supremo de Estados Unidos dispuso que tal norma era sustantiva y exigió su aplicación retroactiva, el análisis aplicado por la Corte Suprema de Connecticut resulta persuasivo para apreciar cómo los estados han interpretado en sus respectivas jurisdicciones los criterios de un watershed rule.

Still, even as we formally adopt the <u>Teague</u> standard of our own volition, we are not bound by the U.S. Supreme Court's determination of fundamental fairness. Rather, we will independently review cases to determine whether they meet our understanding of fundamental fairness. <u>Danforth v. State</u>, 761 N.W.2d 493 (2009).

Ahora bien, en <u>Montgomery v. Louisiana</u>, supra, la Corte Suprema de Estados Unidos aclaró que, aun cuando los estados tienen la libertad de ampliar la retroactividad de una nueva norma penal constitucional en sus jurisdicciones, éstos no pueden negarse a aplicar retroactivamente una norma así fijada por la doctrina jurisprudencial. En este caso, se determinó que cierta norma constitucional clasificada como sustantiva tenía que ser aplicada retroactivamente a todos los casos, incluidos los ya finales y firmes, como un asunto de mandato constitucional. En palabras del Máximo foro federal:

The Court now holds that when a new substantive rule of constitutional law controls the outcome of a case, the Constitution requires state collateral review courts to give retroactive effect to that rule. <u>Teague</u>'s conclusion establishing the retroactivity of new substantive rules is best understood as resting upon constitutional premises. That constitutional command is, like all federal law, binding on state courts.

A modo de resumen, la Profa. Iris Rosario Nieves nos explica que:

[C]uando la Corte Suprema de los Estados Unidos enuncia una nueva norma de carácter constitucional, los estados vienen obligados a determinar, previo al alcance de la retroactividad, si la misma es de naturaleza procesal, sustantiva o procesal medular (<u>watershed</u>). Del resultado de ese ejercicio, podrá concluirse, de acuerdo con las excepciones

de _Teague_, si la aplicación retroactiva de la norma alcanza a casos que ya advinieron finales y firmes. En esa encomienda, los estados están en la libertad de decidir si otorgar mayor amplitud retroactiva a una norma meramente procesal, por ejemplo; es decir, aplicarla a casos que ya hubiesen advenido finales y firmes. Esa libertad, sin embargo, no debe confundirse con el hecho de que cuando se está ante una norma de naturaleza sustantiva, la misma debe ser aplicada retroactivamente, puesto que los estados no tienen discreción para hacer lo contrario, aun en casos finales y firmes. I. Rosario Nieves, _Alcance de la retroactividad de las normas constitucionales enunciadas jurisprudencialmente: una réplica al profesor Ernesto Chiesa_, In Rev, 19 de abril de 2019, http://revistajuridica.uprrp.edu/inrev/index.p hp/2019/04/19/alcance-de-la-retroactividad-de-las-normas constitucionales-enunciadas-jurisprudencialmente-una-replica-al-profesor-ernesto-chiesa/.

Así también lo reconoció la disidencia en _Ramos v. Louisiana_, supra, al destacar la posibilidad de que las cortes estatales pudieran extender la aplicación retroactiva de esta nueva norma constitucional que nos ocupa. ("And in Oregon, the State most severely impacted by today's decision, watershed status may not matter since the State Supreme Court has reserved decision on whether state law gives prisoners a greater opportunity to invoke new precedents in state collateral proceedings."). (Alito J. Opinión disidente). Cónsono con ello, el Juez Alito añadió que:

> Under our case law, a State must give retroactive effect to any constitutional decision that is retroactive under the standard in _Teague v. Lane_, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), but it may adopt a broader retroactivity rule. _Montgomery v. Louisiana_, 577 U.S. --- (2016); _Danforth v. Minnesota_, 552 U.S. 264, 275 (2008). Íd.

Precisamente, a raíz de Ramos v. Louisiana, supra, la Jueza Presidenta del Tribunal Supremo de Luisiana ha adelantado que la nueva norma de veredicto unánime de culpabilidad debe aplicar en su jurisdicción a todos los casos, incluso aquellos finales y firmes. State v. Gipson, 296 So.3d 1051 (2020); Dennis v. Vannoy, 299 So.3d 54 (2020) (Mem). Tal razonamiento encuentra apoyo ya sea bajo la interpretación de Teague v. Lane, supra, por tratarse de un watershed rule, o bajo la propuesta de apartarse completamente de tal normativa federal y adoptar un nuevo estándar de retroactividad a nivel estatal.[12]

### III

### A.

Como he mencionado, la controversia presente en el caso del señor Alers De Jesús se reduce a determinar si la nueva norma constitucional de carácter penal sobre el requisito de un veredicto unánime de culpabilidad debe aplicar en nuestra jurisdicción de manera retroactiva a casos ya finales y firmes. Ello, pues no existe duda en que esta nueva norma

---

[12]Véase, State v. Thomas, 306 So.3d 430 (2020) (Mem); State v. Withers, 306 So.3d 429 (2020) (Mem); State v. Walker, 304 So.3d 63 (2020) (Mem); State v. Brooks, 302 So.3d 1112 (2020) (Mem); Cassard v. Vannoy, 302 So.3d 523 (2020) (Mem); State v. Johnson, 301 So.3d 1177 (2020) (Mem); State v. Sims, 301 So.3d 17 (2020) (Mem); State v. Kidd, 300 So.3d 828 (2020) (Mem); State v. Carter, 300 So.3d 834 (2020) (Mem); Lawson v. State, 300 So.3d 858 (2020) (Mem); State v. Johnson, 300 So.3d 858 (2020) (Mem); Hernández v. Vannoy, 300 So.3d 857 (2020) (Mem); State v. Triplett, 300 So.3d 854 (2020) (Mem); State v. Spencer, 300 So.3d 855 (2020) (Mem); State v. Williams, 300 So.3d 856 (2020) (Mem); State v. Eaglin, 300 So.3d 840 (2020) (Mem); Smith v. State, 300 So.3d 859 (2020) (Mem).

aplica a casos activos en nuestros tribunales, según lo reconocimos en Pueblo v. Torres Rivera, supra.

Para recapitular, ya sabemos que la normativa federal de retroactividad respecto a las nuevas normas jurisprudenciales de índole constitucional penal se rige por Teague v. Lane, supra, y su progenie. Bajo esta normativa, se reconoció la exigencia de Griffith en cuanto a que las nuevas normas jurisprudenciales penales que incidan con derechos constitucionales tienen que ser aplicadas retroactivamente a todos los casos que no fuesen finales y firmes. No obstante, a ese postulado general, Teague le añadió dos (2) excepciones en las que la nueva norma pudiera aplicar retroactivamente a todos los casos, incluidos los ataques colaterales. Esas excepciones son: (1) que la nueva norma sea sustantiva, o (2) que la nueva norma sea clasificada como un watershed rule. Esta última implica una norma procesal que resulta trascendental en la adjudicación de la culpabilidad o inocencia de un acusado, incidiendo en la confianza y certeza de tal fallo.

Ahora bien, como se sabe, los estados y Puerto Rico están obligados a seguir esas garantías mínimas constitucionales reconocidas por la Corte Suprema de los Estados Unidos. Conforme a ello, tenemos que reconocer, **como mínimo**, estas excepciones a la retroactividad. Por consiguiente, debemos considerar e incluir las dos (2) excepciones de Teague al momento de determinar la retroactividad de una nueva norma federal penal de índole constitucional. Particularmente,

porque esas dos (2) excepciones amplían jurídicamente el posible alcance de alguna norma constitucional relacionada con los derechos y las garantías en los procesos penales. En otras palabras, se trata de unas excepciones que benefician a los acusados y a las personas que se enfrentaron a un proceso criminal.

**B.**

Una vez establecido que las excepciones de Teague tienen que formar parte de nuestro análisis jurídico, procede evaluar su interpretación y aplicación. Esto implica analizar si el requisito de veredicto unánime de culpabilidad es una nueva norma constitucional y si esta norma está contemplada en las excepciones, es decir, si es sustantiva o watershed. Ello, como punta de lanza para el análisis correspondiente a los fines de definir el alcance de retroactividad de esta norma.

De entrada, no cabe la menor duda de que el requisito de veredicto unánime de culpabilidad constituye una nueva norma bajo el esquema de Teague. Ello, al punto que modifica el ordenamiento jurídico de dos (2) estados, al igual que el ordenamiento jurídico de Puerto Rico. Previo a la norma pautada en Ramos v. Louisiana, supra, la Constitución de Puerto Rico reconocía la validez de la votación por mayoría en un juicio por jurado. Ahora, se requiere una votación unánime para lograr una convicción, como parte del derecho fundamental a juicio por jurado. En consecuencia, en Pueblo v. Torres Rivera, supra, reconocimos y aplicamos la nueva

norma constitucional. Entiéndase, bajo la nueva norma jurisprudencial federal, las convicciones por votación mayoritaria que antes se reconocían como válidas, ya no lo son. De este modo, la Corte Suprema de los Estados Unidos elevó a rango constitucional el requisito de un veredicto unánime de culpabilidad.

Así, lo que corresponde es determinar si la nueva norma es sustantiva, procesal o un watershed rule con el propósito de evaluar su aplicación retroactiva a casos finales y firmes. Esta decisión resulta complicada en muchas ocasiones porque las normas penales pueden tener entremezclados asuntos sustantivos y procesales.

La nueva norma que tenemos ante nuestra consideración no es propiamente sustantiva porque no incide de manera directa sobre los elementos de algún delito o conducta clasificada como delictiva o sobre las personas a las que les será aplicada algún estatuto penal.[13] Más bien, es de índole procesal por tratarse de un asunto que incide sobre la manera en que se determinará la culpabilidad de un acusado o acusada.

Ahora bien, **por las implicaciones directas que tiene con la certeza del veredicto y con las nociones básicas de justicia, no**

---

[13]Aunque no es una norma estrictamente sustantiva, reconozco que pudiera haber implicaciones de derecho sustantivo debido al contexto de discrimen racial y político (tanto en Estados Unidos como a nivel local respectivamente), lo cual incide en las personas que se han visto históricamente afectadas por veredictos de culpabilidad no unánimes y que motivó la adopción de la norma que nos ocupa.

**estamos ante una simple norma procesal, sino ante un <u>watershed</u> <u>rule</u>. Particularmente, considerando los derechos constitucionales aquí ceñidos y las garantías individuales que permean en nuestro sistema de justicia penal.**

Según nos adelantó el Prof. Luis Alberto Zambrana al respecto:

> Hay razones muy potentes para elaborar teorías que propendan a considerar esta norma como procesal-medular o *watershed*. Es extremadamente difícil cumplir con los criterios de <u>Teague</u> para ello, pero existen fundamentos muy razonables que tienden a caracterizar esta regla constitucional como medular durante el proceso penal. Empezando, de hecho, por el carácter consustancial de la unanimidad del veredicto respecto al derecho constitucional a juicio por jurado. A la luz de esta decisión, la unanimidad no es un elemento que pueda separarse del significado y función del derecho a juicio por jurado en el contexto jurídico angloamericano, sino parte constituyente que le da sentido al mismo. Si la unanimidad del veredicto de culpabilidad tiene esa relevancia tan significativa en la existencia misma del juicio por jurado, razones habrá para considerarla una norma más trascendental que cualquier otra de carácter meramente procesal. Además, no debemos olvidar el carácter democrático que impregna la institución del juicio por jurado y su necesaria legitimación a la hora de adjudicar culpabilidad penal. L. A. Zambrana, <u>Ramos v. Louisiana: juicio por jurado y racismo estructural</u>, Microjuris, 20 de abril de 2020, https://aldia.microjuris.com/2020/04/20/ramos-v-louisiana-juicio-por-jurado-y-racismo-estructural/.

Ciertamente, el precedente de <u>Ramos v. Louisiana</u>, supra, dio un giro dramático al entendimiento de lo que es justo y válido al momento de un jurado rendir un veredicto de culpabilidad. Hoy, la unanimidad constituye un elemento esencial para declarar culpable a un acusado. Con el sólo

voto de un jurado se evita un fallo de culpabilidad, lo que hace más retante el trabajo del Ministerio Público y del propio jurado. La prueba presentada en el juicio tiene que convencer a doce (12) personas de que la culpabilidad se probó más allá de duda razonable. De lo contrario, no habría un fallo de culpabilidad. Al requerirse que el veredicto de culpabilidad del jurado sea unánime, habrá mayor precisión y rigurosidad, no sólo en la prueba presentada en el juicio, sino en la manera de adjudicarla.

La nueva norma, forzosamente, aumenta la certeza de los veredictos. "The proponents of the jury system maintain that a greater degree of accuracy is guaranteed from this process of give and take which is invariably essential to reaching unanimity." US v. Fioravanti, 412 F.2d 407, 417-418 (3d Cir. 1969).

Asimismo, lo ha conceptualizado la American Bar Association al expresar que:

> A requirement that jury debate continue until a unanimous verdict is reached leads to a more thorough and careful consideration of the facts and issues in jury deliberations. In addition, but no less important, the requirement of a unanimous verdict creates a heightened sense of accuracy in fact finding, legitimacy in the verdict, and overall justice, both for society and for the defendant". American Bar Association Standards for Criminal Justice 15-1.3 Chapter 15: Trial by Jury Standards 3rd Edition (1996).

Incluso, la nueva exigencia del veredicto unánime de culpabilidad incide en la psicología de los miembros del jurado, lo que repercute aún más en la certeza de su votación final. "En los estudios psicológicos hay coincidencia en

señalar que a medida que los requisitos para alcanzar los veredictos menores, la profundidad de la discusión disminuye. La posibilidad de emitir veredictos no unánimes modifica la forma de obtención del consenso". P. de Paúl Velasco, Procesos psicosociales en la deliberación del jurado, Estudios de Criminología, Vol. 2, Ediciones de la Universidad de Castilla-La Mancha, (1999), pág. 166.

Como vemos, bajo un estudio lineal de los criterios de lo que pudiera ser una norma procesal medular, sostengo que la exigencia de la unanimidad en la votación del jurado para lograr una convicción se ubica bajo tal clasificación. Ello, porque le brinda mayor certeza al veredicto y, con ello, impregna el proceso mismo de un sentido mayor de justicia.

Sin embargo, además de cumplir con los criterios delineados para la clasificación de un watershed rule, las garantías individuales relacionadas directa o indirectamente con esta nueva norma están sustentadas por un análisis más abarcador. Los derechos constitucionales imbricados en nuestra jurisdicción exigen que así sea reconocido.

### C.

Como es sabido, estamos atados a las garantías mínimas reconocidas por la jurisprudencia del Tribunal Supremo de Estados Unidos, pero no así para ampliar las mismas. Como Máximo foro judicial en esta jurisdicción, tenemos la facultad de interpretar los criterios del watershed rule de una manera más flexible y cónsona con los derechos consagrados en nuestra Constitución. Así, aun en el escenario

de que la Corte Suprema de los Estados Unidos estableciera que la norma de la unanimidad en el veredicto del jurado fuese estrictamente procesal y no reconociera su aplicación retroactiva a los casos finales y firmes, este Tribunal tiene la potestad para determinar lo contrario y garantizar en nuestra jurisdicción tal aplicación retroactiva.

Adviértase que los foros recurridos estatales no rehuyeron a su obligación y dispusieron de la controversia de autos, aunque adjudicándola erróneamente a mi juicio. A nivel federal, el Tribunal Supremo de Estados Unidos se encuentra atendiendo la controversia en el recurso de Edwards v. Vannoy, No. 19-5807. Indistintamente de lo que resuelva ese Foro, el Tribunal Supremo de Puerto Rico tiene la misma libertad y criterio propio que han ejercido otros tribunales estatales en ésta y otras controversias de retroactividad. Entonces, resulta preocupante y cuestionable por qué este Tribual no asumió su rol de pautar el derecho aplicable.

Aclarado lo anterior, veamos por qué sostengo que la nueva norma constitucional de veredicto unánime de culpabilidad debe tener una aplicación retroactiva a los casos ya finales y firmes en virtud de nuestro ordenamiento jurídico y que así debemos reconocerlo.

La votación del jurado no se limita a un asunto aritmético por la cantidad de votos necesaria para declarar la culpabilidad de un acusado en un proceso criminal. Incide directamente sobre las garantías constitucionales que protegen a las personas sometidas a un proceso penal, como

lo son: el derecho a juicio por jurado, derecho al debido proceso de ley, derecho a un juicio justo e imparcial y a la presunción de inocencia. Por ello, la unanimidad en el jurado no se puede apreciar como un asunto meramente procesal cuando están impregnados tantos derechos de rango constitucional.

Debemos tener presente que la Constitución de Puerto Rico, a diferencia de la Constitución de Estados Unidos, reconoce expresamente como derechos fundamentales el derecho a la vida, a la libertad, a la igualdad y a la dignidad humana. Art. II, Secs. 1 y 7, Const. PR, Tomo 1. Ello, particularmente como consecuencia de los eventos históricos y sociales que nutrieron nuestra Constitución. Así, nuestro ordenamiento constitucional se benefició de la Declaración Universal de Derechos Humanos y la Declaración Americana de los Derechos y Deberes del Hombres, los cuales tenían como propósito materializar el respeto por los derechos humanos, la dignidad, la igualdad y la libertad. E. Vicente Rivera, Una mirada a la interpretación de los derechos económicos, sociales y culturales en las decisiones del Tribunal Supremo de Puerto Rico, 44 Rev. Jur. UIPR 17, 20 (2009). A raíz de lo anterior, se enmarcaron los derechos a la dignidad y a la igualdad en términos mucho más amplios y abarcadores que en la Constitución de los Estados Unidos.

"Con el énfasis que se le dio a la noción de igualdad, y teniendo en perspectiva que la Constitución debe ser entendida como el documento en el que 'se recogen las normas más importantes de la vida del país y los acuerdos y

aspiraciones fundamentales de la comunidad', queda claramente establecido el deseo del Pueblo de perpetuar en nuestro ordenamiento jurídico el trato igualitario de los seres humanos ante la ley". (Citas omitidas). E.J. Rivera Juanatey, Discrimen por antecedentes penales: hacia una reconsideración del discrimen por condición social, 41 Rev. Jur. UIPR 585 (2007). Así, "[l]a igualdad es ingrediente medular del ideal de justicia que constantemente late en la Constitución". P.R.P. v. E.L.A., 115 DPR 631, 633 (1984). Por consiguiente, no podemos olvidar que en nuestra jurisdicción la dignidad y la igualdad de las personas son valores jurídicos supremos que deben guiar toda interpretación constitucional. Garib Baizán v. Auxilio Mutuo, 2020 TSPR 69 (Opinión disidente del Juez Asociado Estrella Martínez). Por tanto, no podemos apartarnos de tales principios a la hora de analizar la controversia jurídica planteada por el señor Alers De Jesús.

La interpretación de la Constitución de Puerto Rico no puede caer en un insularismo que derrote sus aspiraciones, como tampoco puede limitarse a mirarse en el espejo de la Constitución federal, que, por su naturaleza, no es germana en lo que atañe a las garantías constitucionales antes mencionadas. En Puerto Rico, distinto al ordenamiento federal, el principio de igualdad es prioritario. Por ello, debe superar otros principios como la deferencia y la finalidad de las sentencias. Ciertamente, esos son principios importantes que tienen valor en nuestro ordenamiento, pero

que no pueden ir por encima de la igualdad y la justicia. Así, la interpretación federal se da en un contexto diametralmente distinto al nuestro, el que no se sostiene en Puerto Rico.

Con todo lo anterior presente, no me queda más que sostener que **todos los ciudadanos y las ciudadanas de nuestra jurisdicción que enfrenten o hayan enfrentado un proceso criminal tienen derecho a todas las protecciones y garantías individuales constitucionales aquí involucradas. Ello, independientemente si sus procesos criminales estén aún activos en nuestros tribunales o ya cuenten con una sentencia condenatoria final y firme.** Concluir lo contrario, implicaría dejar a esas personas, que ya fueron procesadas criminalmente, desprovistas de los derechos más elementales reconocidos en nuestra Carta de Derechos.

No reconocer la retroactividad de esta nueva norma constitucional a todos los ciudadanos y las ciudadanas que confrontaron un juicio por jurado sería brindarles un trato desigual e injusto. Además, equivaldría a mantener personas privadas de su libertad bajo un estado de derecho derogado y que no tuvieron la oportunidad de beneficiarse del actual reconocimiento constitucional. Por un accidente del tiempo, personas son desprovistas de una protección constitucional que incide en sus derechos más elementales como el derecho a la vida y a la libertad. No podemos privar a ciertos ciudadanos o ciudadanas del disfrute de una garantía individual por el mero hecho de que ésta se hubiera

reconocido posterior a su sentencia o trámite apelativo. Este proceder implicaría dejar a estas personas desprovistas de un derecho fundamental del que otros sí se beneficiarán exclusivamente por el factor tiempo.[14] Así, como lo resalta el Prof. Julio Fontanet:

> ¿Cómo puede argumentarse que personas procesadas en determinado momento tienen derecho a un juicio por unanimidad y no los que fueron procesados un día antes? ¿Cómo puede trazarse una línea divisoria tan arbitrariamente en el ejercicio de un derecho fundamental? J. Fontanet, Veredictos unánimes: causas antipáticas, pero justas, Nuevo Día, 1 de junio de 2020.

Es de conocimiento de todos y todas que el sistema de justicia no es ni puede ser perfecto, por lo que no podemos adherirnos a una finalidad de las sentencias que no necesariamente implica un dictamen justo y con la protección de las garantías individuales. Los derechos constitucionales de los individuos que son procesados criminalmente no deben estar restringidos por criterios temporales y procesales, sino que deben ser reconocidos en cualquier etapa del proceso, incluidos los ataques colaterales. En una jurisdicción donde el derecho a la vida, a la libertad y a la igualdad son de alto rango, la finalidad de un dictamen

---

[14]Nuestro estado de derecho permite que cualquier persona privada de su libertad en virtud de una sentencia dictada por el Tribunal de Primera Instancia pueda solicitar su anulación ante el planteamiento de que es contraria a las leyes o Constitución tanto de Puerto Rico como de Estados Unidos o, entre otros fundamentos, por cualquier ataque colateral. 34 LPRA Ap. II, R. 192.1. Contrario a otras jurisdicciones, esta moción no tiene límite de término alguno, es decir, puede ser presentada en cualquier momento. Íd.

no puede sobrepasar tales derechos. Más aún, la finalidad de las sentencias no puede ir por encima de los principios básicos de la justicia y la equidad. A fin de cuentas, se trata de una injusticia manifiesta.

Resulta inconcebible que una persona quede privada de esta norma constitucional por el sólo hecho de que su proceso apelativo hubiese culminado un tiempo antes de que se publicara el caso normativo federal de Ramos v. Louisiana, supra. El efecto de excluirle del alcance de esta nueva norma constitucional es castigar a la parte que fue diligente en ese trámite apelativo. Es un contrasentido que, por el contrario, alguien que no fue diligente en la etapa apelativa o cuyo proceso se extendió por factores ajenos, sí se beneficie de un nuevo juicio al aplicársele el caso normativo. Esto sí incide en las premisas básicas de lo que es justicia. Como juez del Tribunal Supremo de Puerto Rico tengo la obligación y responsabilidad de velar por las garantías y derechos constitucionales, en este caso en particular, de los derechos de los acusados y de quienes tienen privada su libertad. En la ponderación de intereses, entre la finalidad de los dictámenes y la protección a nuestros derechos constitucionales, la balanza debe inclinarse a favor de lo último.

Un razonamiento similar fue adoptado por la Jueza Presidenta del Tribunal Supremo de Luisiana en cuanto a la aplicación retroactiva de la nueva norma de unanimidad en la votación del jurado:

There is no principled or moral justification for differentiating between the remedy for a prisoner convicted by that law whose case is on direct review and one whose conviction is final. Both are equally the product of a racist and unconstitutional law. If concerns of comity and federalism ultimately mean that the federal courts do not force us to remedy those convictions which are already final through a writ of habeas corpus, the moral and ethical obligation upon courts of this state to address the racial stain of our own history is even more compelling, not less. State v. Gipson, supra.

A ello, agregó:

We should not reject retroactivity through a fear that we will "provoke a 'crushing' 'tsunami' of follow-on litigation." Ramos, 140 S. Ct. at 1406. The Court made clear in Ramos that such functionalist assessments have no place in considering fundamental rights. "The deeper problem is that the [*Apodaca*] plurality subjected the ancient guarantee of a unanimous jury verdict to its own functionalist assessment in the first place." Id. at 1401–02. Likewise, such a functionalist assessment should have no place in our decision as to whose convictions will be remedied by Ramos. Even if we performed such a functionalist assessment, the benefits of applying Ramos retroactively greatly outweigh the costs. To be sure, addressing a history of legally-sanctioned racism in our criminal justice system will come with a significant fiscal and administrative cost. But it is a cost we must bear if we mean to show that we guarantee all Louisianans equal justice. We must not "perpetuate something we all know to be wrong only because we fear the consequences of being right." Id. at 1408. The cost of giving new trials to all defendants convicted by non-unanimous juries pales in comparison to the long-term societal cost of perpetuating—by our own inaction—a deeply-ingrained distrust of law enforcement, criminal justice, and Louisiana's government institutions. Íd.

De la discusión pública sobre el tema, surge una preocupación por el efecto económico y carga de trabajo en nuestros tribunales

a consecuencia de esta aplicación retroactiva. Sin embargo, ante la protección de derechos constitucionales, esos efectos secundarios no pueden tener prioridad. "In particular, the value of fairness should trump economic costs when the stakes are highest for the prisoner. Where the impact on the question of innocence or on the sentencing determination is significant, fairness should prevail. The cost of failing to accord prisoners human rights far outweighs the economic costs of remedying earlier errors or malfeasance." W. Berry III., supra. **No podemos dejar de reconocer garantías individuales por los costos económicos o por preferencias particulares**.

Indistintamente, las garantías constitucionales individuales no pueden reconocerse y, peor aún, limitarse a base de consideraciones económicas. El derecho al voto es ejercido por millones de personas y es costoso. A nadie se le ocurriría limitarlo por consideraciones económicas o por ser muchas las personas que tienen que ejercerlo. En tiempos de crisis es que aflora la necesidad de reconocer los derechos humanos. Es por ello que debemos repudiar y descartar esa metodología adjudicativa.

Con todo este marco jurídico en mente, sostengo que el requisito de un veredicto unánime de culpabilidad, como asunto de derecho fundamental, debe aplicarse retroactivamente a los casos ya finales y firmes, incluido al señor Alers De Jesús. Como garante de los derechos individuales, no puedo más que concluir que la exigencia de

un veredicto unánime de culpabilidad es un requisito procesal crucial y medular (<u>watershed rule</u>) en los procesos penales, por lo que su aplicación debe ser retroactiva. Como vimos, esta nueva exigencia constitucional, no es meramente un asunto aritmético, sino de contenido. No lo podemos ver como un asunto meramente procesal, restringiéndolo a un asunto numérico de votación. Éste incide directamente con la culpabilidad o inocencia de un ser humano, pues esta nueva norma llega al punto de que un sólo miembro del jurado puede evitar que una persona sea declarada culpable. Asimismo, coarta los derechos constitucionales más elementales de la ciudadanía y las garantías de las personas procesadas criminalmente, extendiéndose hasta un nivel de justicia social. Así, la noción más básica de justicia me lleva a reafirmar que un evento procesal no puede soslayar los derechos constitucionales aquí en juego.

En ese sentido, es un paso no meramente cuantitativo sino también cualitativo y medular, dirigido a erradicar un trato desigual o discriminatorio. Precisamente, no reconocer la retroactividad de la norma fundamental, aborta gran parte de la esencia fundamental que inspiró el reconocimiento de la nueva norma, ya que beneficiará a unos sí y a otros no.

**IV**

Por las razones expuestas, disiento del proceder mayoritario. Así, hago constar que hubiese expedido el recurso de autos, revocado a los foros recurridos y reconocido la aplicación retroactiva del requisito

fundamental de veredicto unánime de culpabilidad en juicios por jurado a casos finales y firmes.


                              Luis F. Estrella Martínez
                                   Juez Asociado